Alfred MORRIS, Appellant,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY.

No. 84–5306.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1985.

Decided Jan. 17, 1986.

As Amended Jan. 17, 1986.

David J. Ontell, with whom Peg Shaw, Washington, D.C., was on brief for appellant.

Walter A. Smith, Jr., with whom Vincent H. Cohen, Robert B. Cave, Susan M. Hoffman and Keith R. Fisher, Washington, D.C., were on brief for appellee.

Arthur B. Spitzer, Elizabeth Symonds, Richard A. Frank and Michael E. Fine, Washington, D.C., were on brief for amicus curiae American Civil Liberties Union Fund of the National Capital Area, urging reversal.

John J. Beall, Jr., Richmond, Va., was on brief for amicus curiae State of Maryland, et al., urging affirmance.

Before WRIGHT, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Concurring opinion filed by Circuit Judge J. SKELLY WRIGHT.

BORK, Circuit Judge:

Alfred Morris appeals the district court's dismissal of his complaint against the Washington Metropolitan Transit Authority ("WMATA"). *See Morris v. WMATA,* 583 F.Supp. 1522 (D.D.C.1984). We affirm the dismissal because, as the district court held, WMATA's limited sovereign immunity prevents liability from attaching in this case.

## I.

On November 6, 1966, Congress consented to, and enacted for the District of Columbia, a compact whose signatories were Maryland, Virginia, and the District of Columbia. *See* Washington Metropolitan Area Transit Authority Compact, Pub.L. No. 89–774, 80 Stat. 1324 (1966) ("WMATA Compact"). The Compact created WMATA to operate a mass transit system for the District of Columbia and the surrounding suburban areas of Maryland and Virginia. Section 76 of the Compact, as originally enacted, *see* 80 Stat. 1349, and as amended in 1976 by Pub.L. No. 94–306, 90 Stat. 672, authorizes WMATA to maintain a Transit Police Force.

Alfred Morris was employed by WMATA as a Transit Police officer from November 4, 1974, until his discharge, effective October 22, 1976. Morris alleged that WMATA discharged him in retaliation for his past statements asserting racial discrimination against himself and other black officers by the Transit Police Force. Morris' amended complaint claimed that his discharge from the Transit Police Force violated 42 U.S.C. § 1983 (1982) and the first and fourteenth amendments.[1] Morris sought compensatory and punitive damages. The district court concluded that it lacked jurisdiction since the eleventh amendment barred appellant's claim against WMATA.

## II.

WMATA's sovereign immunity exists because the signatories have successfully conferred their respective sovereign immunities upon it. Congress has power to legislate for the District of Columbia and to create an instrumentality that is immune from suit. Maryland and Virginia have

---

1. Appellant's original complaint contained two counts alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e–2(a)(1) & 2000e–3(a) (1982), and one count alleging a violation of the first amendment freedom of speech. The first amendment claim was tried before a jury which returned a general verdict in favor of WMATA. The Title VII claims were voluntarily dismissed with prejudice after the jury returned its verdict on the first amendment claim. Appellant appealed the judgment entered upon the jury's verdict, challenging several evidentiary rulings by the trial court, but did not appeal the ruling on the Title VII counts. A panel of this court concluded that the trial court erroneously excluded some of Morris' testimony and vacated the district court's judgment. *See Morris v. WMATA,* 702 F.2d 1037 (D.C.Cir.1983). In addition, the court *sua sponte* raised the possibility that Morris' suit against WMATA was barred by the eleventh amendment. *See id.* at 1041.

immunity under the eleventh amendment and each can confer that immunity upon instrumentalities of the state. It is clear that each of the three signatories attempted to confer its sovereign immunity upon WMATA. We think they succeeded and that the partial waiver of that immunity in the Compact does not extend to this case. We address the question of waiver first.

Section 80 of the WMATA Compact provides in pertinent part:

The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.

80 Stat. 1350. The threshold question is whether WMATA's operation of the Transit Police Force constitutes a governmental or a proprietary function within the terms of the Compact. This is a question of federal law since "congressional consent transforms an interstate compact within [the Compact] Clause into a law of the United States." *Cuyler v. Adams*, 449 U.S. 433, 438, 101 S.Ct. 703, 66 L.Ed.2d 641 (1980).

■ The principle is well-established that the operation of a police force is a governmental rather than a proprietary function. " 'If the operation of a police force is not a governmental function, then a governmental function may not exist.' " *Martin v. WMATA*, 667 F.2d 435, 436 (4th Cir.1981) (*quoting Bryant v. Mullins*, 347 F.Supp. 1282, 1286 (W.D.Va.1972) and *citing* McQuillin, *The Law of Municipal Corpo-*

*rations* §§ 53.29, 53.30, 53.51 (3d ed. 1977)); *see Capital Transit Co. v. District of Columbia*, 225 F.2d 38, 41 (D.C.Cir. 1955). Morris does not seriously contest this point since he stated below that he "agrees that operating a police force is a governmental function."[2] Morris' Record Excerpts ("R.E.") at 55. The narrow question is whether operating a police force includes the promulgation and enforcement of the police regulations here involved. We hold that it does. In this case, Morris' notice of dismissal cited seventeen violations of police regulations during twenty-three months of service. R.E. at 6. These violations included the loss of police equipment such as Morris' baton, handcuffs and police cap as well as multiple instances of absence from duty without leave and unexcused tardiness. *See* Trial Transcript of Nov. 14, 1980 at 297–405. After five instances of unjustified tardiness, Morris was sent a letter of official reprimand which admonished: "You should ... be advised that continued instances of tardiness shall result in severe disciplinary action being taken even to the extent that could cause your termination from the Metro Transit Police." *Id.* at 315–16. Less than two weeks later, Morris was cited again for unexcused tardiness. *Id.* at 317. Regulations prohibiting unexcused absence from duty and tardiness as well as those requiring officers to maintain possession of basic police equipment are essential for the provision of effective and continuous police protection. Given the regulations enforced in this case, there is no question that WMATA's dismissal of Morris occurred in the performance of a governmental function.

---

2. Nevertheless, Morris now states that he "does not concede that WMATA was necessarily acting in a 'governmental' capacity when it committed the tort" and argues that the Compact requires that what constitutes a governmental function be determined according to District of Columbia law. *See* Brief for Appellant at 28–29. Even assuming that Morris is permitted to raise this point on appeal, he plainly misreads the Compact. The Compact provides that WMATA's *liability* for its torts committed in the conduct of

any proprietary function shall be determined "in accordance with the law of the applicable signatory," not that what constitutes a governmental or proprietary function shall be so determined. Once Congress gives its consent, an interstate compact becomes federal law. *See Cuyler*, 449 U.S. at 438, 101 S.Ct. at 706. Accordingly, we must determine as a matter of federal law whether WMATA's conduct occurred in the performance of a governmental function.

There is also no doubt that section 80 of the Compact indicates an intention by the signatories to avoid tort liability arising out of the performance of a governmental function.

Morris argues, however, that section 81 of the WMATA Compact constitutes a complete waiver of sovereign immunity, *see* Brief for Appellant at 22–23, and that section 80 relates only to the existence or nonexistence of a cause of action, *see id.* at 27–28. We fail to see that this distinction, even assuming it to be valid, makes a difference in this case. Morris argues that he has been deprived not of a court with jurisdiction but only of a remedy. *See id.* at 27. This, in turn, is said to mean that he may obtain a factual determination whether WMATA's action was in performance of a governmental function. But just such a determination is also required before sovereign immunity will attach. Here, the district court held on undisputed facts that WMATA acted in the performance of a governmental function and we have upheld that conclusion. Whether section 80 deprives the district court of jurisdiction or deprives Morris of a remedy, the result is that Morris' complaint was properly dismissed.

In any event, we think Morris misinterprets the Compact. "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the test as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (*quoting Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Sections 80 and 81 should read as parts of a coherent whole. Section 80 provides that WMATA "shall be liable for its contracts and for its torts ... committed in the conduct of any proprietary function, ... but shall not be liable for any torts occurring in the performance of a governmental function." 80 Stat. 1350. Section 81 provides that "[t]he United States District Courts shall have original jurisdiction, concurrent with the Courts of Maryland and Virginia, of all actions brought by or against the Authority." *Id.* We agree with the district court that "[t]he reasonable construction of the two sections, read together, is that WMATA has consented to be sued for torts committed in the performance of *proprietary* functions and such suits may be brought in United States District Courts," but that "WMATA has expressly retained its immunity from suit for torts committed in the performance of *governmental* functions." 583 F.Supp. at 1525 (emphasis in original). We can think of no intelligible purpose the signatories might have served by destroying any cause of action for torts committed in the performance of a governmental function and subsequently waiving sovereign immunity for just such torts. Yet it is this incoherent intention that Morris' reading requires. We find the district court's reading much more natural.

The last sentence of section 80 reinforces our conclusion that section 80 was meant to relate to sovereign immunity rather than to the existence of a cause of action. That sentence provides: "Nothing contained in this [Compact] shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the Zone of any immunity from suit." 80 Stat. 1350. The purpose of the sentence is to ensure that WMATA's partial waiver of immunity will not be attributed to the entities which created WMATA as well. By including the disclaimer in section 80, the drafters showed that they understood WMATA's waiver to be contained in that section.[3]

---

**3.** Morris concedes that there is no alternative argument that WMATA's power to "[s]ue and be sued," WMATA Compact § 12(a), 80 Stat. 1328, operates as a waiver of WMATA's immunity in federal courts. *See* Brief for Appellant at 22. The Supreme Court rejected essentially the same contention in a case involving a Florida agency authorized to "sue and be sued." *See* Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Association, 450 U.S. 147, 150 (1981); *accord Trotman v. Palisades Interstate Park Commission,* 557

Thus, unless we determine that WMA-TA's immunity is constitutionally insufficient, Morris' claim was properly dismissed. We turn to that question now.

### III.

■ By virtue of its sovereignty, the United States enjoys immunity from suit without its consent. Long ago, Chief Justice Hughes observed that

> there is no express provision that the United States may not be sued in the absence of consent.... But by reason of the established doctrine of the immunity of the sovereign from suit except upon consent, the provision of Clause one of § 2 of Article III does not authorize the maintenance of suits against the United States.

*Monaco v. Mississippi*, 292 U.S. 313, 321, 54 S.Ct. 745, 747, 78 L.Ed. 1282 (1934). Further, it is well-settled that "Congress may endow a government agency or instrumentality with governmental immunity from suit or execution," P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 1350 (2d ed.1973), and that Congress' "power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations." *Maricopa County v. Valley National Bank of Phoenix*, 318 U.S. 357, 362, 63 S.Ct. 587, 589, 87 L.Ed. 834 (1943).

Congress played a particularly active role in creating WMATA. Notably, Congress, not the states, initiated the WMATA Compact. *See* S.Rep. No. 1491, 89th Cong., 2d Sess. 3–4 (1966). The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17. Pursuant to this power, Congress "adopt[ed] and enact[ed]" the WMATA Compact for the District of Columbia. *See* Pub.L. No. 89–774, 80 Stat. 1324 (1966). Congress also gave its consent to Maryland and Virginia to enter into the WMATA Compact, as required by U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State....").

In creating WMATA, Congress consented only to suits against WMATA for its torts "committed in the conduct of any proprietary function," expressly retaining WMATA's immunity from suit for "torts occurring in the performance of a governmental function." *See* WMATA Compact § 80, 80 Stat. 1350, and our discussion *supra* pp. 5–7. There seems no question that the United States could validly confer its immunity upon WMATA. Whether that, standing alone, would be sufficient to defeat Morris' suit we need not decide because we also hold that the other signatories, Maryland and Virginia, validly conferred the constitutional immunities they possess.

### IV.

The eleventh amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

This limitation upon the jurisdiction of federal courts results in an immunity for states. Though the amendment refers expressly only to suits against a state by citizens of another state, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as

---

F.2d 35, 39–40 (2d Cir.1977) (although "sue and be sued" clause in interstate compact may waive compacting states' immunity in their own courts, it does not waive eleventh amendment immunity in federal courts). Moreover, reliance on the "sue and be sued" clause would be particularly inappropriate in this case where another section of the Compact, § 80, specifically and expressly delineates the scope of WMATA's consent to be sued. That scope is clear: WMATA consents to be sued for torts occurring in the performance of propriety, but not governmental, functions.

well as by citizens of another State." *Edelman*, 415 U.S. at 662–63, 94 S.Ct. at 1355. This rule makes appellant's citizenship irrelevant. Moreover, though the immunity is that of the state, "some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (footnote omitted).

Though this latter observation may make it appear that the sole criterion for the application of eleventh amendment immunity in a suit for money damages is that a judgment would have the same practical consequences as a judgment against the state, that is not the only standard the Supreme Court has employed.

### A.

In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the respondent claimed that the school board's refusal to renew his contract as a teacher violated constitutional rights and sued for reinstatement and back pay. The Supreme Court examined the board's claimed eleventh amendment immunity and produced an analysis that considered several factors. Justice Rehnquist's opinion for a unanimous Court began by drawing a dichotomy from prior decisions: "The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances ... but does not extend to counties and similar municipal corporations." 429 U.S. at 280, 97 S.Ct. at 572 (citations omitted). It is instructive to set out the Court's parsing of the reasons for its answer to the question of which side of that dichotomy the board fell on.

> The answer depends, at least in part, upon the nature of the entity created by state law. Under Ohio law the "State" does not include "political subdivisions," and "political subdivisions" do include lo-

cal school districts. Petitioner is but one of many local school boards within the State of Ohio. It is subject to some guidance from the State Board of Education and receives a significant amount of money from the State. But local school boards have extensive powers to issue bonds and to levy taxes within certain restrictions of state law. On balance, the record before us indicates that a local school board such as petitioner is more like a county or city than it is like an arm of the State.

*Id.* (citations omitted).

Perhaps the most important aspect of that passage for our purposes is that the Court looked to the "nature of the entity created by state law," found several factors relevant, and decided the case according to the "balance" of those factors. It will be useful to set out the factors here.

The first factor was that under state law the "State" did not include "political subdivisions" but the latter term did include local school districts. It would appear to follow that the board was excluded by state law from the category of entities that could share an eleventh amendment immunity. But it is not entirely clear whether the Court was using the state's categorization as an indicator of the state's intention with respect to school boards or as a structural feature that the Court would look to regardless of the state's intention. In any event, it was clear that the state had displayed no positive intention to confer eleventh amendment immunity upon school districts and, further, that the state's categorization of such districts as political subdivisions would, when the Supreme Court's dichotomy was applied, defeat such immunity. Perhaps this was not dispositive because the Court could not be certain that the state had the Court's dichotomy in mind in devising its own categories. The important point for the present case is that the state's characterization counted for something and, in that case, counted against the immunity.

We cannot be sure whether the Court's statement that the petitioner school board

was but one of many boards within the state was a factor in the Court's analysis, and we cannot see why it should be. If it is not, the second factor is that the board was "subject to some guidance" from the state and received "a significant amount of money" from the state. "[S]ome guidance" is less than control or even substantial regulation, but it is a degree of control and the state monies might be used to pay a judgment against the board, though that is not clear. This state involvement, presumably, weighed in favor of an immunity. But it seems to have been offset, in whole or in part, by the third factor, that the board had extensive powers to issue bonds and to levy taxes, which suggests that the board could pay a judgment out of its own funds. The power to tax would seem particularly important, for, without that, the board could hardly sell bonds whose interest and principal amount it could not pay.

The Court found that the board was, "[o]n balance," more like a city than an arm of the state, and hence entitled to no eleventh amendment immunity.

The Supreme Court again employed the state agency-political subdivision dichotomy in *Lake Country Estates* to decide the issue of eleventh amendment immunity. Tahoe Regional Planning Agency ("TRPA") was an entity created by compact between California and Nevada to create and regulate development in the Lake Tahoe Basin which lies partly in each state. Petitioners owned property in the Basin and sued for monetary and equitable relief, alleging that TRPA's land-use ordinance and other conduct had destroyed their land's economic value in violation of the Constitution.

Justice Stevens, writing for the Court, stated the test for the immunity: "Unless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose, there would appear to be no justification for reading additional meaning into the limited language of the Amendment." 440 U.S. at

401, 99 S.Ct. at 1177. This is language of intention and structure. Evidently both the states' and Congress' intention to confer immunity must be manifest and, in addition, the structure of the agency must be such that it is not "comparable to a county or municipality." *Id.*

Examining "[t]he intentions of Nevada and California, the terms of the Compact, and the actual operation of TRPA," the Court was persuaded that these conditions were not met. 440 U.S. at 402, 99 S.Ct. at 1178. California and Nevada filed briefs insisting they had no intent to confer any immunity upon TRPA. They pointed to a provision of the Compact describing TRPA as a "political subdivision" and another specifying that six of TRPA's governing members are appointed by counties and cities and only four by the two states. Funding came from the counties, not the states, and the Compact expressly provided that TRPA's obligations were not binding on either state. The Court also noted that TRPA's function, the regulation of land use, is traditionally a function performed by local governments. *Id.* And TRPA's exercise of its authority was not subject to state veto. *Id.* That TRPA was not subject to state control was shown by the fact that California had unsuccessfully tried to control TRPA by suing it. *Id.*

Thus, it was obvious that the states did not intend any immunity, they characterized TRPA as a political subdivision, they could not control TRPA, a judgment against TRPA would not affect either state's treasury, and TRPA was performing the function of local rather than state government.

### B.

■ If we apply the factors set out in *Mt. Healthy* and *Lake Country Estates* to this case, they point very strongly to the conclusion that Maryland and Virginia have conferred their eleventh amendment immunities upon WMATA.

There can be no doubt of Maryland's and Virginia's intentions in this regard. In sharp contrast to the litigation behavior of

California and Nevada in *Lake Country Estates*, Maryland and Virginia have filed a joint brief *amici curiae* stating their intent to confer immunity on WMATA.[4] We may not completely discount this litigation position because the Supreme Court gave weight to such a position in *Lake Country Estates*. Moreover, here as there, the litigation position of the signatory states is supported by the provisions of the Compact. Most importantly, section 80 of the WMATA Compact explicitly disclaims liability "for any torts occurring in the performance of a governmental function." 80 Stat. 1350. And, whereas the TRPA compact referred to TRPA as a "political subdivision" (which has no eleventh amendment immunity), section 2 of the WMATA Compact states that the Compact's purpose is "to create a regional instrumentality, as a common agency of each signatory party."[5] 80 Stat. 1325. In significant contrast, the WMATA Compact refers on numerous occasions to entities other than WMATA as "political subdivisions." *See, e.g.*, WMATA Compact §§ 12(f), 14(c)(1), 29, 41, 70(a), 82(a), 80 Stat. 1329, 1330, 1335, 1338, 1347, 1351. Thus, it is absolutely clear that Maryland, Virginia, and the Congress of the United States intended that WMATA should receive the eleventh amendment immunity of the states for torts of the sort alleged here.

When we turn from purpose to structure, we again find the indicia of immunity. As was said in *Lake Country Estates*, an agency may "invoke the Amendment in order to protect the state treasury from liability that would have … essentially the same practical consequences as a judgment against the State itself." 440 U.S. at 401, 99 S.Ct. at 1177 (footnote omitted). Because we deal with "practical consequences," it is not necessary that the state be obligated to pay a judgment, but only that that would be the result. *See Edelman*, 415 U.S. at 664–65, 94 S.Ct. at 1356–57; *accord Lake Country Estates*, 440 U.S. at 402, 99 S.Ct. at 1177 (looking to "actual operation" of TRPA).

It is clear that the practical result of a judgment against WMATA here would be payment from the treasuries of Maryland and Virginia. Although the Compact's stated policy is "that, as far as possible, the payment of costs shall be borne by the persons using or benefitting from [WMATA's] facilities and services," WMATA Compact § 16, 80 Stat. 1331, fare revenues have never come close to covering WMATA's costs. This shortfall was foreseen. Under the Compact, "any remaining costs shall be equitably shared among the federal, District of Columbia, and participating local governments," as "determined by agreement among them" pursuant to the Compact.[6] *Id.* The federal government has agreed to be primarily responsible for WMATA's *construction* costs. *See* National Capital Transportation Amendments of 1979, Pub.L. No. 96–184, 93 Stat. 1320 (1980) (appropriating up to $1.7 billion in construction grants to WMATA). But Congress expressly made such funding contingent on the local participating governments or Compact signatories providing WMATA

---

**4.** In finding that WMATA is an instrumentality of the signatory states, the district court relied on the fact that in an unrelated case Maryland and Virginia had filed a brief *amici curiae* in the Supreme Court declaring that WMATA is an arm of the states entitled to eleventh amendment immunity. *See* 583 F.Supp. at 1524. Since Maryland and Virginia have now filed a similar brief in this case, we need not address appellant's claim that the district court's reliance on the first brief was misplaced.

**5.** That the WMATA Compact was enacted before the establishment of the instrumentality/political subdivision test renders the terms of the Compact no less relevant to our inquiry. To be sure, the terms of a compact enacted after the establishment of the test would be highly probative evidence of intent to confer immunity since "instrumentality" and "political subdivision" are now terms of art under the test. But here, as in *Lake Country Estates* itself, the terms of the Compact are still evidence of whether the states intended to structure their agency as an instrumentality or as a political subdivision.

**6.** Specifically, the Compact leaves it to regional transportation agencies of Maryland and Virginia to contract with WMATA to determine the extent of their respective state's financial commitments to WMATA. *See* WMATA Compact § 18(a) & (b), 80 Stat. 1332.

with a "stable and reliable source of revenue sufficient to meet" WMATA's *operating* deficits.[7] *See* 93 Stat. 1322.

In response, both Maryland and Virginia have appropriated substantial funds for this purpose. For example, Virginia appropriated approximately $42,000,000 for 1983 and 1984 to the Northern Virginia Transportation Commission, directing that "[f]unds for Metro Rail shall be paid by the [Commission] to the Washington Metropolitan Area Transit Authority" and that "[a]dditional funds from a stable and reliable source required by Public Law 98–184 [96–184] are to be provided to Metro Rail from payments authorized in this item and pursuant to [Va. Code §§ 58.1–1720 to 1724 (1984)]."[8] 1982 Va. Acts ch. 684. Similarly, Maryland amended its transportation laws to provide that "the Department [of Transportation] shall provide for annual grants to the Washington Suburban Transit District for a share of the operating deficits of the regional transit system for which the district is responsible.... The Department's share shall equal 75 percent of the operating deficit."[9] Md.Transp. Code Ann. § 10–205(b) (1985 Supp.). A judgment against WMATA would necessarily be paid out of WMATA's operating budget and correspondingly increase WMATA's operating deficit. Given the practicalities of Maryland's and Virginia's financial commitments to WMATA, a judgment

against WMATA would directly affect the treasuries of Maryland and Virginia.[10]

In this regard, WMATA is significantly different from the entities considered in *Mt. Healthy* and *Lake Country Estates*. In *Mt. Healthy*, the Supreme Court considered whether a local school board was entitled to eleventh amendment immunity. The Court noted that the school board received substantial funding from the state, but emphasized that "local school boards have extensive powers to issue bonds ... and to levy taxes." 429 U.S. at 280, 97 S.Ct. at 573. Given the school board's potential source of independent financing, a judgment against the school board would not necessarily increase the amount of the state's funding to the board. Moreover, in *Mt. Healthy*, the state was not obligated to provide the school board with any funding. The Court concluded that, on balance, a local school board is more like a political subdivision than an arm of the state. *See id.* By contrast to the school board in *Mt. Healthy* and to local governments generally, WMATA has no authority to levy taxes. Although WMATA is authorized to issue bonds, *see* WMATA Compact § 27, 80 Stat. 1335, WMATA "may pledge the contracts of" "any signatory party, political subdivision or agency thereof," as security for those bonds. *See* WMATA Compact § 29, 80 Stat. 1335. Thus, any bonds based on Maryland and Virginia contracts would still

7. WMATA's operating budget deficit runs approximately $200 million a year. *See* Lynton, *Metro's Deficit: Relentless Problem,* Washington Post, Apr. 17, 1983, at B1, B7.

8. Under §§ 58.1–1720 to 1724, signed into law on March 20, 1980, Virginia levied a two percent sales tax on fuels sold in every county or city in which a rapid heavy rail commuter mass transportation system operates. *See* Va. Code § 58.1–1720 (1984). The proceeds of the tax are deposited in a special state fund which is then "distributed monthly to the applicable transportation district commission of which the county or city is a member to be applied to the operating deficit and debt service of the mass transit system of such district." Va. Code § 58.1–1724 (1984). The tax is levied by Virginia and goes into the state's treasury before being distributed to the transportation district commissions which act as mere conduits between the state

treasury and mass transit systems, of which WMATA is one.

9. Maryland's contribution apparently comes directly from the state's general revenues.

10. Morris filed suit in the district court on May 23, 1980. 583 F.Supp. at 1523. Prior to this date, Maryland and Virginia had committed themselves to providing a "stable and reliable source of revenue" to fund WMATA's operating deficits. Although neither enactment was to become effective until July 1, 1980, both Va. Code §§ 58.1–1720 to 1724 (1984) and Md. Transp. Code Ann. § 10–205(b) (1985 Supp.) were signed into law prior to May 23, 1980, on March 20, 1980 and May 20, 1980, respectively. Thus, we need not consider whether WMATA would be immune had Morris' suit been filed prior to the funding commitments by Maryland and Virginia.

directly affect the states. Given the practicalities of the situation, either the federal government or Maryland and Virginia, or all three, would have to pay the interest and principal.

In *Lake Country Estates*, as discussed previously, the Supreme Court considered the eleventh amendment immunity of TRPA, an interstate agency created by California and Nevada. The Court concluded that TRPA does possess immunity, relying in part on the fact that "[f]unding under the Compact *must* be provided by the counties, not the States." 440 U.S. at 401–02, 99 S.Ct. at 1177 (emphasis added) (footnote omitted). The WMATA Compact, by contrast, does not prohibit Maryland and Virginia from providing funds to WMATA and, in practice, Maryland and Virginia have committed themselves to contributing substantial amounts towards WMATA's operating deficits. The *Lake Country Estates* Court also emphasized the fact that "instead of the state treasury being directly responsible for judgments against TRPA, [the compact] expressly provides that obligations of TRPA shall *not* be binding on either State." *Id.* at 402, 99 S.Ct. at 1177. The WMATA Compact contains no analogous provision and the commitments by Maryland and Virginia to fund WMATA mean that a judgment against the Authority will have a direct impact on the state treasuries.

Despite these differences between this case and *Lake Country Estates*, it may be thought that the latter case establishes the proposition that voluntary subsidies by states to an agency do not bring the situation within the rationale of the eleventh amendment. If that line of argument is pursued, we do not think the payments to WMATA by Maryland and Virginia are aptly characterized as "voluntary." Congress agreed to pay WMATA's construction costs but required either local governments or the state signatories to make up operating deficits. If WMATA was to survive, only the treasuries of the signatory states could make up those deficits, and they did. There is no point in arguing that the states need not have done so, for the alternatives

were the collapse of WMATA, which the states were not obliged to countenance, or payment of the operating deficits by the United States, in which case the federal government's sovereign immunity would have defeated this lawsuit. We think that, where an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.

It is also important that Maryland and Virginia exercise a high degree of control over WMATA. In *Lake Country Estates*, the Supreme Court indicated that the degree of control that the compacting states exercise over an interstate agency is a significant consideration in determining whether such an agency has eleventh amendment immunity. *See* 440 U.S. at 401–02, 99 S.Ct. at 1177. In rejecting TRPA's claim of immunity, the Court considered it relevant that "[TRPA's] authority to make rules within its jurisdiction is not subject to veto at the state level." *Id.* at 402, 99 S.Ct. at 1177. Rules and regulations adopted by WMATA, however, must be consistent with the existing and *subsequently enacted* laws, ordinances, rules or regulations of Maryland and Virginia, *see* WMATA Compact § 76(e), as amended by Pub.L. No. 94–306, 90 Stat. 672, 673 (1976); inconsistent WMATA rules and regulations are void within the applicable jurisdiction. *See id.* In effect, within their respective jurisdictions Maryland and Virginia retain the power to void any WMATA rule or regulation, thereby providing a potent method for controlling WMATA. The Court also noted that six of the ten governing members of TRPA were appointed by counties and cities, and only four by the states, leaving the states in the minority. Under the WMATA Compact, Maryland and Virginia are each represented by two directors on WMATA's six-member board. *See* WMATA Compact § 5(a), 80 Stat. 1326. Maryland's directors are selected by, and from among, the members of the Wash-

ington Surburban Transit Commission. *Id.* Virginia's directors are selected by, and from among, the members of the Northern Virginia Transportation Commission, *id.,* who in turn are appointed by the governing bodies of the participating counties and cities. *See* Va. Code § 15.1–1348 (1980). Although Maryland and Virginia thus have little control over the appointment of directors to the WMATA Board, the Maryland and Virginia directors may be removed or suspended from office as provided by Maryland and Virginia law, respectively. *See* WMATA Compact § 50(a), 80 Stat. 1326. This gives Maryland and Virginia a significant measure of control over their respective directors, a control that the Supreme Court presumably did not think the states possessed in *Lake Country Estates.*

In short, every factor considered by the Supreme Court in denying immunity in *Mt. Healthy* and *Lake Country Estates* points to the existence of immunity here.

■ It has been argued, nonetheless, that the District of Columbia's participation in creating WMATA destroys WMATA's immunity from suit. We have seen that Congress, acting alone, could have created for the District an instrumentality like WMATA which enjoyed immunity from suit. In fact, Congress actively considered creating a federal or District of Columbia corporation as an alternative to an interstate instrumentality in the event that "Congress [did] not find [the Authority's plans] acceptable." *See* S.Rep. No. 1491, 89th Cong., 2d Sess. 5–7 (1966). Likewise, had Maryland and Virginia created WMATA without the participation of the District of Columbia, we would conclude that WMATA enjoys eleventh amendment immunity as an instrumentality of the states. The argument urged upon us would mean that Congress, in conjunction with the states, constitutionally cannot do what either Congress or the states constitutionally

could do separately. We cannot accept the notion that the sum is less than any of its parts so that when three immunities are added together, all immunities disappear. Acceptance of that mysterious arithmetic would also mean that to maintain immunity from suit while providing mass transportation, Congress would have to create one instrumentality to serve the District of Columbia and the states would have to create another to serve the surrounding suburban areas. This would severely hamper the efficient operation and coordination of mass transportation in the Washington metropolitan area. The Constitution does not demand fatuities.

The judgment of the district court is

*Affirmed.*

J. SKELLY WRIGHT, Circuit Judge, concurring:

I am pleased to join in Judge Bork's fine opinion, particularly as I do not read it to suggest that a state's characterization of a governmental entity can confer Eleventh Amendment immunity absent a binding and ongoing commitment to absorb a substantial portion of that entity's operating deficit. As Judge Bork observes, however, the special facts of this case clearly indicate that such a financial commitment has been made. *See* opinion for the court at 226. Maryland has obligated itself to cover a substantial portion of WMATA's operating deficit. *See* Md.Transp. Code Ann. § 10–205(b) (1985 Supp.). Virginia has earmarked the proceeds of a special tax for application to that deficit. *See* Va. Code § 58.1–1720 (1984).* I therefore agree with Judge Bork's conclusion that WMATA has been a state instrumentality since 1980 and as such is immune under the Eleventh Amendment.

---

* I also note that under § 16 of the WMATA Compact, Virginia has agreed to absorb its equitable share of WMATA's deficit. Thus given Maryland's clear commitment, Virginia is plainly obligated to pay its share of the operating deficit

through supplemental appropriations when its special tax does not cover its share of that deficit. I further note that Virginia has in fact provided such supplemental appropriations.