32 A.3d 75

**WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY**

v.

**Veronica TINSLEY.**

**No. 1089, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Nov. 30, 2011.

Gerard J. Stief (Carol B. O'Keeffe, Mark F. Sullivan, Nicholas L. Phucas, on the brief), Washington, D.C., for appellant.

James W. Taglieri (Cadeaux, Taglieri & Notarius, PC, on the brief), Washington, D.C., for appellee.

Panel: KRAUSER, C.J., HOTTEN, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

After slipping and falling on a wet train platform at a Metrorail station, Veronica Tinsley, appellee, brought a negligence action, in the Circuit Court for Prince George's County, against the Washington Metropolitan Area Transit Authority ("WMATA"), appellant, for the injuries she sustained as a result of that fall. After a jury found in favor of Tinsley and awarded her damages, WMATA noted this appeal, presenting

three issues,[1] one of which is whether Tinsley's suit was barred by governmental immunity. Because we hold that it was so barred, we reverse the judgment of the circuit court. As that decision, in effect, concludes this litigation, we do not reach either of the other two issues raised by WMATA.

## BACKGROUND

At about 4:45 p.m. on December 19, 2007, Tinsley lost her footing on a train platform at the Metrorail stop in Cheverly, Maryland, and fractured her right ankle. At trial, Tinsley testified that, when she arrived by train at the station, the entire floor of the platform was wet. Upon leaving the train, she did not see any warning cones, but, nonetheless, walked carefully toward the elevator. As she neared the elevator, she saw a "wet floor sign that was tucked back by the side of the elevator." Then, finding the elevator out of service, she walked towards the escalator. As she did, her left foot slipped out from under her and she fell.

Tinsley introduced into evidence the redacted videotaped deposition of Francis Mullen, an architect accepted by the court "as an expert in the area of architecture and safety." Mullen deponed that, based on "deposition testimony"—whose testimony he did not specify—"the platforms are supposed to be cleaned after 7 o'clock when the peak period is over for the day."

Then, relying on climatological records from the United States Department of Commerce for Dulles International Airport, Mullen noted that the weather on the day of the accident was cloudy, with a dewpoint around 23 degrees Fahrenheit, air temperature ranging from 30 to 40 degrees Fahrenheit, an average relative humidity of 70 per cent, and with no precip-

---

1. The other two issues raised by WMATA were: "[w]hether the [c]ircuit [c]ourt erred in denying WMATA's motion for judgment where [Tinsley] failed to make a *prima facie* case of negligence" and "admitted that she was fairly warned of the wet platform" before she fell; and "[w]hether the [c]ircuit [c]ourt erred in allowing the testimony of [Tinsley's expert witness] that questioned WMATA's immunized selection of cleaning products."

itation. The platform could not have therefore been wet, he opined, as the result of condensation.

Mullen then described a test he conducted at the train platform in Cheverly, using the cleaning agent "Super Shine–All," a product WMATA used to clean its train platforms. He began by measuring the floor's slip resistance at three different locations in proximity to where Tinsley fell. At each location, he measured slip resistance on a part of the floor which was dry, on a part of the floor which was wet with water only, and on a part of the floor which was wet with a mixture of water and Super Shine–All. After explaining that the greater the coefficient of friction,[2] the more slip-resistant the surface is, he said that the test revealed a coefficient of friction ranging from 0.25 to 0.3, where the floor "was wet with the solution of Super Shine–All diluted as the manufacturer says to dilute it"; to "close ... to .5," where the floor was wet with only water; and to "slightly below. 8," where the floor was dry. Mullen said that a coefficient of friction of 0.5 was a minimum safe standard for floors where people were expected to walk.

Before applying the Super Shine–All for that test, Mullen diluted it with water, as directed by the manufacturer. He then applied it to the floor with a damp mop so as to "create a thin film of liquid on the floor." While the floor was still wet, he measured the floor's slip resistance.

Although he applied the mixture of Super Shine–All and water with a mop and not a cleaning machine, as WMATA routinely does, he maintained that it was "not necessary" to do so. When pressed with the fact that the cleaning machine applies suction to the floor to remove much or most of the

---

2. The coefficient of friction between two solid surfaces is the ratio of the frictional force (tangential to the direction of sliding motion) to the normal (perpendicular) force. Typically the normal force is generated by gravity; i.e., the weight of the object on the surface, although that component is augmented if someone (or thing) presses down on the surface. *See, e.g.,* "The Coefficient of Friction," available at http://www.mathsrevision.net/alevel/pages.php?page=79 (Last visited Nov. 10, 2011).

water from the floor as it is being cleaned, Mullen countered that it "apparently doesn't vacuum all of the liquid off of the floor because all of the accounts say that it was entirely wet" when Tinsley fell.

In addition to Mullen, Tinsley called several WMATA employees to testify during the presentation of her case-in-chief; among them were Michael Myrick, Linwood Vaughn, and Barbara London. Michael Myrick, a custodian, testified that, while working the 3:00 to 11:30 p.m. shift, he would spot clean the floor, including the floor at Cheverly, using a mop and bucket. He said that there were no time restrictions on when he was allowed to mop the floor and that Super Shine–All is "one of the products that [he] use[s] in a mop and bucket."

Linwood Vaughn, a cleaning machine operator, testified that, during his training, he was told that he was supposed to clean the platforms "after rush hour." His practice was to clean the platform, including the one at Cheverly, using the machine and Super Shine–All. He used a mop and bucket only to "cut corners," that is, to clean floor areas that are inaccessible to the cleaning machine. If, however, there was "a water problem or something, you could run [the machine] any time."

Barbara London, the Station Manager, testified regarding periodic inspections she made to monitor for any safety problems. Her checklist for the day of the accident indicated that she had performed inspections at 1:30 p.m., 2:30 p.m., and 3:30 p.m. At no time did she observe any problems such as water leaks or broken pipes.

At the close of Tinsley's case, WMATA moved for judgment, contending, among other things, that "how it cleans its platforms and with what products or mechanisms it cleans its platforms, is something for which it's immune from suit." The circuit court denied the motion.

After reading the deposition of its medical expert into the record, WMATA called two witnesses: Freddie Ross, Assistant Superintendent and Cleaning Manager for WMATA, who supervises the Blue and Orange Lines, which includes the line

Tinsley was riding the day of her injury; and Barbara London, who had previously been called to testify by Tinsley.

Ross testified that machine operators and custodians, in using a mop and bucket, are not restricted only to certain areas, but, rather, may use a mop and bucket anywhere on a train platform. He further stated that there was no time limitation as to when they could run the cleaning machine. London testified that, on the day of the accident, the weather was "sort of misty" and that there was condensation on the platform but conceded that she did not know why the platform was wet. At the conclusion of her testimony, WMATA renewed its motion for judgment.

After denying that motion, too, the trial court permitted the case to go to the jury, which found in favor of Tinsley, awarding $64,213.78 in damages.

## DISCUSSION

WMATA contends that Tinsley's claim was barred by sovereign immunity because the actions of its employees and agents, in maintaining its station, are shielded by that immunity.

We begin our analysis with the observation that, because the signatories to the WMATA Compact—Maryland, Virginia, and the District of Columbia—conferred their respective sovereign immunities upon WMATA, *Morris v. WMATA,* 781 F.2d 218, 219 (D.C.Cir.1986), this "inter-jurisdictional compact agenc[y]" is cloaked in sovereign immunity. *Proctor v. WMATA,* 412 Md. 691, 708, 990 A.2d 1048 (2010). To determine the extent of that immunity, we look to section 80 of the WMATA Compact, a provision enacted to provide a "uniform treatment of WMATA" as "the signatories had differing rules on governmental immunity." *Martin v. WMATA,* 667 F.2d 435, 436 (4th Cir.1981) (per curiam).

Section 80 of the WMATA Compact limns the extent to which WMATA has waived its sovereign immunity, *Proctor,* 412 Md. at 725, 990 A.2d 1048, by drawing a distinction

between what it calls a "governmental function" and what it labels a "proprietary function." Actions committed in the service of the former are protected by sovereign immunity, but those performed in the service of the latter are not.

Specifically, section 80 states:

The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any *proprietary function*, in accordance with the law of the applicable signatory (including rules on conflict of laws), *but shall not be liable for any torts occurring in the performance of a governmental function*. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the zone of any immunity from suit.

(Emphasis added.)

■ Because Congress consented to the creation of WMATA by statutory enactment, Pub.L. No. 89–774, 80 Stat. 1324 (1966), and "congressional consent transforms an interstate compact within [the Compact] Clause into a law of the United States," *Cuyler v. Adams*, 449 U.S. 433, 438, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981),[3] interpretation of the WMATA Compact and, of course, this provision, is a question of federal law. *Sanders v. WMATA*, 819 F.2d 1151, 1154 (D.C.Cir.1987); *accord Proctor*, 412 Md. at 707, 990 A.2d 1048. That is, it is federal, not state, law which governs our determination of "whether the function in question is 'governmental' or 'proprietary' under" section 80. *Sanders*, 819 F.2d at 1154.

As there are no Supreme Court decisions interpreting either section 80 or, for that matter, any other provision of the

---

**3.** The Compact Clause of the United States Constitution states that "[n]o State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." U.S. Const. art. I, § 10, cl. 3.

WMATA Compact, for guidance, we look to decisions of the "federal circuits most likely to hear cases in which WMATA is a party," that is, the United States Court of Appeals for the District of Columbia Circuit and the United States Court of Appeals for the Fourth Circuit. *Lizzi v. Alexander*, 255 F.3d 128, 134 (4th Cir.2001), *abrogated on other grounds, Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

To deal with the difficulty in determining whether a particular act occurs in the performance of a governmental or proprietary function, a difficulty which the Supreme Court has characterized as a "quagmire," *Indian Towing Co. v. United States*, 350 U.S. 61, 65, 76 S.Ct. 122, 100 L.Ed. 48 (1955), those federal circuits have sidestepped the problem by crafting a two-part test. *Smith v. WMATA*, 290 F.3d 201, 206 (4th Cir.2002); *Dant v. District of Columbia*, 829 F.2d 69, 74 (D.C.Cir.1987). Under this judicially created test, which is not to be found in any federal or state statute, a court first determines whether the challenged activity occurs in the performance of a "quintessential governmental function," in other words, functions that involve "obviously public activities," *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C.Cir.1997), such as law enforcement, *Dant*, 829 F.2d at 74; *Morris*, 781 F.2d at 220, or the creation of a public transportation system. *McKethean v. WMATA*, 588 A.2d 708, 714 (D.C.1991).

If so, then governmental immunity applies; if not, the court must decide whether the governmental activity at issue is discretionary. If it is not discretionary, as where a "statute, regulation, or policy specifically prescribes a course of action for an employee to follow," *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the activity is "ministerial" and not protected by governmental immunity. If, on the other hand, the activity is "discretionary," the court must decide whether it falls within what the Supreme Court has termed the "exception for discretionary governmental functions," *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), commonly

referred to, by the federal appellate courts, as the "discretionary function exception."[4] If the discretionary function exception applies to the challenged activity, then that activity, like activity falling within a quintessential governmental function, "constitute[s] [a] 'governmental' activit[y] within the meaning of the 'governmental/proprietary' test" of section 80 of the WMATA Compact, *Smith,* 290 F.3d at 207, and is thus shielded from tort liability.

The term "discretionary function exception" may prove puzzling as it quite naturally invokes the question: "Exception to what?" To answer that question, we need to explain that this category of immunity was first articulated, by federal courts, in an entirely different statutory context, that is, in the setting of the Federal Tort Claims Act ("FTCA"). While, under section 1346(b) of the FTCA, the federal government waives its sovereign immunity as to "civil actions . . . for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant," it retains its sovereign immunity for what it designates as "Exceptions" under section 2680(a) of that Act. Those "Exceptions" are, among other things, "acts of *discretion* in the performance of *governmental functions* or duty 'whether or not the discretion involved be abused.'" *Dalehite v. United States,* 346 U.S. 15, 33, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (quoting 28 U.S.C. § 2680(a) of the FTCA) (emphasis added).[5]

---

**4.** Consequently, cases addressing the discretionary function exception frequently use, as an analytical framework, the so-called "discretionary/ministerial" dichotomy. *See, e.g., Smith v. WMATA,* 290 F.3d 201, 206–07 (4th Cir.2002); *Sanders v. WMATA,* 819 F.2d 1151, 1155 (D.C.Cir.1987). Generally, "discretionary" acts are shielded from tort liability, whereas "ministerial" ones are not. The two tests, "governmental/proprietary" and "discretionary/ministerial," are, however, not "coterminous." *Smith,* 290 F.3d at 206.

**5.** The "Exceptions" also include, among other things, claims "arising out of the loss, miscarriage, or negligent transmission of letters or

Because section 2680(a) is entitled "Exceptions," that is, instances not affected by the general waiver of tort liability set forth in section 1346(b) of the FTCA, the federal courts, limning the boundaries of sovereign immunity under the FTCA, have universally used the term "discretionary function exception," a reference to section 2680(a), when a governmental function is immune from tort liability under the FTCA. Later, the federal courts adopted the same term in defining the contours of immunity under the WMATA Compact, even though it has no comparable section labeled "Exceptions." In other words, the federal appellate courts have incorporated the discretionary function exception of the FTCA into section 80 of the WMATA Compact for purposes of defining the boundaries of governmental immunity. *Dant,* 829 F.2d at 74; *accord Smith,* 290 F.3d at 207. Because they use this term, so shall we to avoid inconsistent language in federal and state caselaw, which would no doubt create more confusion than the phrase itself already has. *See, e.g., Smith,* 290 F.3d at 207 & n. 10.

 A governmental act falls within the discretionary function exception if it "regularly requires judgment as to which of a range of permissible courses is the wisest." *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). As to such acts, WMATA "is immune from any claim, 'however negligently caused, that affect[s] the governmental functions.'" *Smith,* 290 F.3d at 207 (quoting *Dalehite,* 346 U.S. at 32, 73 S.Ct. 956).

In further determining the contours of the discretionary function exception, the Supreme Court has said that "it is the

---

postal matter," claims "arising in respect of the assessment or collection of any tax or custom duty," claims in admiralty for which a remedy is provided in a separate statute, claims for damages "caused by the imposition or establishment of a quarantine by the United States," claims for damages caused by operation of fiscal or monetary policy, claims arising out of military combatant activities, claims arising in a foreign country, and claims arising from activities of the Tennessee Valley Authority or the Panama Canal Company. 28 U.S.C. section 2680(b)-(m).

nature of the conduct, rather than the status of the actor, that governs ... in a given case." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. 2755. And, "[i]n examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee," as "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. Indeed, if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," then that conduct is not discretionary, because "the employee has no rightful option but to adhere to the directive." *Id.* If, on the other hand, "the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield," that is, "governmental actions and decisions based on considerations of public policy." *Id.* at 536–37, 108 S.Ct. 1954.

But the discretionary function exception, as expounded by the Supreme Court, encompasses "more than the initiation of programs and activities." *Dalehite,* 346 U.S. at 35, 73 S.Ct. 956. "It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations," as well as the "acts of subordinates in carrying out the operations of government in accordance with official directions" because, otherwise, "the protection of § 2680(a) [of the FTCA] would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." *Id.* at 35–36, 73 S.Ct. 956.[6]

---

**6.** The seeming tension between this statement from *Dalehite,* extending the discretionary function exception to the acts of subordinates "in accordance with official directions," 346 U.S. at 36, 73 S.Ct. 956, and the previously quoted language that "conduct cannot be discretionary unless it involves an element of judgment or choice," *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), may be reconciled by observing that *Berkovitz* addressed a situation where the plaintiffs alleged that government employees, who were duty-bound to follow official rules and policies, failed to act in conformance with

■ There are, however, "discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception. . . ." *Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267. Those acts are not immune to tort liability because, as the Supreme Court explained, they "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Id.*

To illustrate that point, the Supreme Court later gave the following example of such a discretionary act:

> If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the [discretionary function] exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Id. See also Dalehite,* 346 U.S. at 28, 73 S.Ct. 956.

Thus, not all discretionary acts performed by governmental actors fall within the discretionary function exception and are thereby shielded from tort liability. *Berkovitz,* 486 U.S. at 537, 108 S.Ct. 1954.

Although, as previously noted, there are no Supreme Court decisions interpreting the WMATA Compact, several of its decisions interpreting the FTCA are relevant to our analysis, given that federal case law has engrafted the discretionary function exception of the FTCA onto the WMATA Compact. Two such cases are *United States v. Gaubert, supra,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335, which discusses where the discretionary function exception applies, and *Berkovitz v.*

---

those mandates, whereas, in *Dalehite,* there was no allegation that the subordinates' acts or omissions deviated in any way from their official duties. Thus, where a subordinate acts in accordance with official directions, a plaintiff cannot sidestep the discretionary function exception by challenging the acts of the subordinate, because such a claim is, in effect, a challenge against the discretionary acts of that subordinate's principal.

*United States, supra,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531, which discusses where it does not.

In *Gaubert,* the Supreme Court held that Federal Home Loan Bank regulators, accused of negligently supervising a savings and loan association that subsequently became insolvent, enjoyed governmental immunity.

In so holding, the Supreme Court examined the governing federal regulatory scheme and determined that the "agencies . . . were not bound to act in a particular way." 499 U.S. at 329, 111 S.Ct. 1267. Rather, "the exercise of their authority," observed the Court, "involved a great 'element of judgment or choice.'" *Id.* (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954.). In fact, because "there [was] no statutory or regulatory mandate which compelled the regulators to act in a particular way," nor was there any "prohibition against the use of supervisory mechanisms not specifically set forth in statute or regulation," *Gaubert,* 499 U.S. at 330, 111 S.Ct. 1267, the Court was "convinced that each of the regulatory actions in question involved the kind of policy judgment that the discretionary function exception was designed to shield," *id.* at 332, 111 S.Ct. 1267, that is, "the exercise of discretion in furtherance of public policy goals." *Id.* at 334, 111 S.Ct. 1267.

On the other hand, in *Berkovitz,* the Supreme Court reached a contrary conclusion, though one not inconsistent with *Gaubert.* In that case, a two-month-old child contracted a severe case of polio, after ingesting an oral vaccine that had been approved by Federal agencies. The child and his parents brought suit, under the FTCA, alleging that the National Institutes of Health's Division of Biologic Standards had wrongfully licensed the vaccine manufacturer to produce the vaccine at issue and that the Bureau of Biologics of the Food and Drug Administration had acted wrongfully in approving for release to the public the particular lot of vaccine from which the defective dose had been obtained. Both agencies, the plaintiffs claimed, "violated federal law . . . regarding the inspection and approval of polio vaccines." 486 U.S. at 533, 108 S.Ct. 1954.

In rejecting the Government's claim that the suit should be dismissed because the actions taken by the two agencies fell within the discretionary function exception, the Supreme Court first noted: "The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." *Id.* at 539, 108 S.Ct. 1954. As a result, "[w]hen a suit," as in that case, "charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." *Id.* at 544, 108 S.Ct. 1954.

As for the claim alleging wrongdoing in releasing the vaccine lots, the Supreme Court examined the regulatory scheme and determined that it may have left "no room for implementing officials to exercise independent policy judgment." *Id.* at 547, 108 S.Ct. 1954. If that characterization of the regulatory scheme were true, the claim would not be barred by the discretionary function exception, the Court pointed out, because it was "directed at a governmental action that allegedly involved no policy discretion." *Id.* Although the plaintiffs had not proved their factual allegations concerning the regulatory scheme, they were not, the Court observed, required to do so at that stage of the litigation. As further discovery might assist them in doing so, dismissal of their claim, said the Court, was inappropriate. *Id.* at 547–48, 108 S.Ct. 1954.

Keeping the precepts of *Gaubert* and *Berkovitz* in mind, we turn to two recent post-*Gaubert* appellate decisions involving WMATA and exhibiting fact patterns very similar to the one presented by the instant case. The two cases are: *Smith v. WMATA, supra,* 290 F.3d 201, and *WMATA v. Barksdale–Showell,* 965 A.2d 16 (D.C.2009). Both cases applied *Gaubert* in holding that the discretionary function exception shielded WMATA from tort liability.

*Smith,* the earlier of the two cases, involved the Bethesda Metrorail station, which had three escalators. At the time of the injury, two of the escalators were inoperable because of unanticipated equipment malfunctions. One of the two escalators had been declared, by safety inspectors, to be unsafe for

use, even as a staircase. 290 F.3d at 203–04. During routine maintenance conducted the night before the injury, mechanics discovered a problem involving a second escalator which rendered it "potentially unsafe . . . to operate," and it, too, was inoperable, as it "was in a state of disassembly awaiting a replacement part." *Id.* at 204. Consequently, the third escalator was placed in a "stationary mode," to be used as a staircase.

Smith, a Metrorail patron, was climbing that escalator, on a sweltering summer day, when he suffered a fatal heart attack. His estate later brought an action for wrongful death against WMATA. The estate contended, among other things, that WMATA was negligent in its decision to use the only available escalator in "stationary mode" and in choosing not to reassemble, on an emergency basis, one of the two inoperable escalators so that it could be used as a staircase. *Id.* at 203–04.

The Fourth Circuit held that WMATA was immune from liability under the discretionary function exception in deciding to use the only functioning escalator as a staircase. It observed that, in the absence of a statutory or regulatory mandate specifically governing the situation, "[WMATA] personnel at the Bethesda station were forced to make difficult choices" and that their choice implicated WMATA's "mission—public transportation—and its ability to fulfill that mission in a safe and efficient manner." *Id.* at 209.

The Fourth Circuit further held that the discretionary function exception shielded WMATA's decision not to reassemble the other escalator. Observing that the latter decision was " 'susceptible to policy analysis,' " *id.* (quoting *Gaubert, supra,* 499 U.S. at 325, 111 S.Ct. 1267), that it was also not governed by any "specific statutory or regulatory mandate," and that "the potential choices implicated the economic policy of [WMATA]," that is, whether it was more cost effective to re-assemble the escalator pending repair, or to leave it disassembled and wait for the replacement parts to arrive, the appellate court declared that, "[e]ven if this decision had been

incorrect, and even if it had constituted an abuse of discretion, it [was], under the circumstances, deserving of immunity protection." *Id.* at 210 (citing *Dalehite, supra,* 346 U.S. at 33, 73 S.Ct. 956).

The second post-*Gaubert* decision we regard as instructive is *Barksdale–Showell, supra,* 965 A.2d 16. That case, though decided by a different appellate court, follows the same course and reaches the same destination as the Fourth Circuit did in *Smith.* In *Barksdale–Showell,* the plaintiff slipped and fell down a wet escalator at the Anacostia Metrorail station, after which she brought suit against WMATA, on the grounds that WMATA had failed to take reasonable steps to ensure that its floors and escalators remained dry on a wet, snowy day and, furthermore, to warn customers of the hazardous conditions.

The District of Columbia Court of Appeals affirmed the trial court's rulings that governmental immunity barred the negligent maintenance and operation claim but not the failure to warn claim. *Id.* at 18. The District of Columbia appellate court avowed that, under WMATA's standard operating procedure, "upon encountering a hazard, the employee is vested with a decision of whether the hazard can be rendered safe, how it may be rendered safe, and whether the employee will actually render it safe." *Id.* at 22. It further asserted that the discretion contemplated under the standard operating procedure was " 'subject to policy analysis' and thus discretionary," because WMATA employees implementing their standard procedure had to balance the operational necessity of ensuring efficient passenger flow through its facilities against the cost and probable ineffectiveness of continual mopping of floors and escalators. *Id.* at 23 (quoting *Gaubert, supra,* 499 U.S. at 323, 111 S.Ct. 1267).

As to the negligent failure to warn claim, the District of Columbia court determined that "WMATA's lack of a policy underlying its decision not to warn [of the potentially slippery conditions] is certainly not the kind of 'social, economic, or political' decision that Congress intended to immunize from

suit," and, consequently, it held that the claim was not barred. 965 A.2d at 21 n. 4.

We turn now to the instant case. Since it is undisputed that WMATA's platform cleaning and maintenance is not a "quintessential governmental function," we proceed directly to the second stage of the analysis and determine whether the actions at issue fall within the discretionary function exception and, therefore, are immune to suit, or whether they fall without that exception and, therefore, are not.

As *Gaubert* instructs, it is immaterial that the WMATA employees alleged to have acted negligently in the case at bar included cleaning and maintenance workers in addition to management. 499 U.S. at 325, 111 S.Ct. 1267. As previously noted, "[i]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines, supra,* 467 U.S. at 813, 104 S.Ct. 2755. The nature of the decisions at issue here—whether to clean an entire platform or to spot clean it; whether to clean during rush hour, late at night, or otherwise; whether to use a cleaning machine or a mop and bucket; and finally, which cleaning agent to use—"regularly requires judgment as to which of a range of permissible courses is the wisest." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267.

Moreover, this case presents an altogether different fact pattern than *Berkovitz.* In *Berkovitz,* the Supreme Court held, as previously discussed, that dismissal of the complaint was improper where it was alleged that government employees, who were duty-bound to follow federal law and regulations, failed to act in conformance with those mandates, and those failures, if proven, would not fall within the discretionary function exception. Here, in contrast, there was no law or directive defining when or how WMATA could clean. Rather, the instant case is similar to *Smith,* where the Fourth Circuit observed that no statutory or regulatory mandate specifically governed WMATA's decision as to how most appropriately to

operate its only functioning escalator and that, consequently, that decision was discretionary. 290 F.3d at 209.

Given the absence of an applicable statute or specific mandatory directive, we conclude that WMATA's employees were performing discretionary acts in deciding at what time the train platforms were to be cleaned, as well as the manner and means used in so doing. Consequently, Tinsley's challenge is, in effect, to the discretionary acts of WMATA personnel. But, as we have previously explained, those discretionary acts are "of the kind that the discretionary function exception was designed to shield," *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954, that is, "conduct that involves the permissible exercise of policy judgment." *Id.* at 539, 108 S.Ct. 1954. And, as in *Smith*, the exercise of discretion by WMATA's employees in determining when and how to clean and maintain its facilities is directly related to WMATA's "mission—public transportation—and its ability to fulfill that mission in a safe and efficient manner." 290 F.3d at 209. Consequently, the discretionary function exception bars Tinsley's claim, and it was error to deny WMATA's motion for judgment. Furthermore, as the *Smith* Court observed, even if the decision to clean the platforms during business hours was "incorrect" or "constituted an abuse of discretion," it still fell within the discretionary function exception. *Id.* at 210; *accord Dalehite*, 346 U.S. at 33, 73 S.Ct. 956.

We now turn to Tinsley's specific arguments in support of her contention that her claim is not barred by governmental immunity. Framing the matter as "a simple negligence case," Tinsley insists that there was testimony that WMATA had a policy not to use cleaning machines on its platforms during peak travel times; that the wet platform could not have been caused by weather conditions or water leaks and that, under the circumstances, the only plausible explanation for the wet floor was that a WMATA employee had used a cleaning machine the afternoon of the accident, in violation of its policy, which "did not give the employees any discretion regarding the timing of cleaning the entire platform area before 7:00 at night." Hence, under *Berkovitz*, governmental immunity, as-

serts Tinsley, does not shield the behavior of this unknown WMATA maintenance man, who acted in direct violation of WMATA's policy and proximately caused her injury.

Tinsley claims, in the alternative, that, even if WMATA's employees were not required to adhere to a rigid maintenance policy, "WMATA presented absolutely no evidence at trial" to support its assertion that "its cleaning decisions were grounded in political, social or economic judgments." Thus, governmental immunity, asserts Tinsley, does not apply.

Finally, Tinsley maintains that WMATA should clean its platforms during the early morning hours when the stations are closed. She contrasts the instant case with *WMATA v. Barksdale–Showell, supra,* 965 A.2d 16, where, as noted previously, the District of Columbia Court of Appeals held that the plaintiff's claim of negligent maintenance and operation was barred by governmental immunity. According to Tinsley, *Barksdale–Showell* is distinguishable from the instant case because the hazardous condition in that case resulted from inclement weather, whereas the hazard, here, "arose because WMATA caused the floor to become wet and slippery by its own actions." Thus, in her view, the particular actions taken by the (unknown) WMATA employee in cleaning the floor of the Cheverly station were avoidable, did not involve the exercise of discretion within a range of permissible choices, and were more akin to negligent driving, as explicated in *Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267.

Even assuming, *arguendo,* that, at trial, Tinsley introduced sufficient circumstantial evidence that the platform was wet as a result of efforts to clean it by WMATA employees, she offered no evidence that any WMATA employee operated a cleaning machine or applied a mop negligently. Rather, Tinsley has consistently argued, both here and below, that WMATA should be required to clean its platforms during the early morning hours when the stations are closed and suggested that cleaning the platform during afternoon rush hour "actively" created a hazard. In effect, Tinsley asserts that we should recognize an "active/passive" distinction and that the discre-

tionary function exception should only apply where WMATA is passively responding to an emergency.

Tinsley further relies on *O'Toole v. United States,* 295 F.3d 1029 (9th Cir.2002), to buttress her argument that the discretionary function exception "should not cover hazardous conditions *created* by WMATA itself" and that WMATA's employees' failure to properly maintain the platform is not barred from tort liability. *O'Toole,* a case brought under the FTCA, presented the issue of whether a federal agency, specifically, the Bureau of Indian Affairs, enjoyed immunity when, for budgetary reasons, it had neglected to maintain an irrigation ditch on its property, resulting eventually in flood damage to the property of neighboring landowners. After exhausting their administrative remedies, the land owners filed a negligence action against the United States in the United States District Court for the District of Nevada. The district court granted the Government's motion to dismiss, ruling that the failure to repair and maintain the irrigation ditch "was the result of a policy decision involving allocation of scarce [Bureau of Indian Affairs] resources" and, as such, was barred by the discretionary function exception. *Id.* at 1032.

The United States Court of Appeals for the Ninth Circuit rejected the Government's argument that budgetary decisions and maintenance scheduling were policy matters and were thus covered by governmental immunity, explaining that to "allow[ ] the irrigation system to fall into disrepair is no more a conscious regulatory choice than failing to maintain the brakes on a car." *Id.* at 1036. It warned that "[t]he danger that the discretionary function exception will swallow the FTCA is especially great where the government takes on the role of a private landowner.... Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources." *Id.* at 1037 (citation omitted). The Ninth Circuit therefore held that the Bureau of Indian Affairs's decision to allow the irrigation system to fall into disrepair was not shielded from liability under the FTCA and reversed the district court's grant of a motion to dismiss. *Id.* at 1037.

Citing the just-quoted language from *O'Toole* warning against the danger that the discretionary function exception will swallow the FTCA, Tinsley contends that the discretionary function exception "should be read narrowly." This argument, in effect, urges us to ignore the well-settled rule that " 'a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign.' " *Lizzi v. WMATA*, 156 Md.App. 1, 9, 845 A.2d 60 (2003) (quoting *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999)). Consequently, we decline to construe the discretionary function exception so narrowly. It is not, in our view, restricted only to actions taken in response to external events, as in *Barksdale–Showell*, 965 A.2d at 23 (holding that decisions of WMATA employees regarding "the maintenance, repair, inspection, and operation of the escalators," made in response to weather emergency, fell within discretionary function exception), and *Smith v. WMATA*, *supra*, 290 F.3d 201 (holding that WMATA's decision to operate escalator in "stationary mode," where all other escalators were unexpectedly out of service, fell within discretionary function exception).

Hence, we do not find Tinsley's attempt to distinguish *Barksdale–Showell* from the case at bar persuasive. Like its standard operating procedure for dealing with weather-related hazards, a procedure which *Barksdale–Showell* held was shielded by governmental immunity, WMATA's cleaning and maintenance policies were flexible enough to allow its maintenance personnel to respond to potential hazards. Whether to operate a cleaning machine or use a mop and bucket, and when to do so, are decisions " 'subject to policy analysis' and thus discretionary." 965 A.2d at 23 (quoting *Gaubert*, *supra*, 499 U.S. at 323, 111 S.Ct. 1267).

Contrary to Tinsley's claim, there are no easy choices in deciding the appropriate time for cleaning train platforms. As WMATA points out, *not* cleaning the platforms during business hours may also create hazardous conditions. Hundreds and perhaps thousands of patrons pass through any given

Metrorail station in a single day,[7] and it is inevitable that they will leave behind trash, clothing, debris, food, cups, bottles, and other items too numerous to mention.

Moreover, Tinsley's reliance on *O'Toole* is misplaced. The crux of *O'Toole* was the government's *failure* to maintain its facilities. The Ninth Circuit held "that an agency's decision to forego, for fiscal reasons, the routine maintenance of its property—maintenance that would be expected of any other landowner—is not the kind of policy decision" that is shielded from tort liability. *Id.* at 1036. Relying on *Gaubert*, it concluded that the agency's decision to neglect its property was more akin to "a government employee's negligent driving," *see Gaubert*, 499 U.S. at 325 n. 7, 111 S.Ct. 1267, than to "an FDA decision not to approve a drug for sale, or a National Park Service decision not to put up a guardrail that will block visitors' views," and, consequently, "was not a decision 'susceptible to policy analysis.' " 295 F.3d at 1037 (quoting *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267).

But it is Tinsley's contention, not that WMATA has failed to perform a duty, but that it has negligently failed to select a specific time for performance, leaving it to its maintenance personnel to make that decision, depending on the circumstances. While choosing to forego a duty may cross the line demarcating those acts which are not shielded by sovereign immunity from those which are, the reasonable exercise of discretion as to when and how to perform maintenance at a facility does not.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF APPELLANT. COSTS TO BE PAID BY APPELLEE.**

---

7. In fiscal year 2007, the average daily ridership of Metrorail was 723,000. *Transit Ridership Trends and Markets* at 1 (Cambridge Systematics, Inc. Mar. 2009), available at http://www.wmata.com/pdfs/planning/FINAL% 20Transit% 20Ridership% 20and% 20Markct% 20Trends% 20Report.pdf (last visited Nov. 10, 2001). The same year in Maryland, average weekday Metrorail boardings were 155,571. *Id.* at 12. There are twenty-six Metrorail stations in Maryland. *Id.* at 11.