55 A.3d 663

Veronica TINSLEY

v.

**WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY.**

Kim Hodge

v.

**Washington Metropolitan Area Transit Authority.**

Nos. 1, 25, Sept. Term, 2012.

Court of Appeals of Maryland.

Oct. 26, 2012.

218

James W. Taglieri (Cadeaux, Taglieri & Notarius, P.C., Washington, DC), on brief, for petitioner/cross-respondent.

Gerard J. Stief, Sr. Associate Gen. Counsel (Carol B. O'Keefe, Gen. Counsel, Mark F. Sullivan, Deputy General Counsel, and Nicholas L. Phucas, Asst. Gen. Counsel, Washington, DC), on brief, for respondent/cross-petitioner.

H. David Leibensperger, Berman, Sobin, Gross, Feldman & Darby, LLP, Towson, MD, for amicus curiae brief of the Maryland Association for Justice.

James S. Liskow (DeCaro, Doran, Siciliano, Gallagher & DeBlasis, LLP, Bowie, MD), on brief, for appellant/cross-appellee.

Gerard J. Stief, Sr. Associate Gen. Counsel (Carol B. O'Keefe, Gen. Counsel, Mark F. Sullivan, Deputy General Counsel, and Janice L. Cole, Associate General Counsel, Washington, DC), on brief, for appellee/cross-appellant.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and MCDONALD, JJ.

BATTAGLIA, J.

This consolidated opinion resolves two cases heard by this Court concerning the appropriate scope of the Washington Metropolitan Area Transit Authority's (WMATA) immunity from suit. In both cases, Veronica Tinsley and Kim Hodge, Petitioners herein, slipped, fell, and were injured at WMATA

operated metrorail stations. They present a common question of whether their claims are barred by Section 80 of the WMATA Compact, Section 10–204(80) of the Transportation Article, Md.Code (1977, 2008 Repl.Vol.).[1] Ms. Hodge also presents an additional question of whether Section 75 of the Compact limits the scope of WMATA's immunity,[2] such that its alleged failure to abide by various Prince George's County Code Sections renders an immunity defense unavailable.[3] In

---

1. Section 80 of the Compact states:
 **80. Liability for contracts and torts.**
 The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the zone of any immunity from suit.
 Section 10–204(80) of the Transportation Article, Md.Code (1977, 2008 Repl.Vol.). Unless otherwise noted, all references to Section 80 are to Section 10–204(80) of the Transportation Article, Md.Code (1977, 2008 Repl.Vol.).

2. Section 75 of the Compact states:
 **75. Compliance with laws, regulations, and ordinances.**
 The board shall comply with all laws, ordinances and regulations of the signatories and political subdivisions and agencies thereof with respect to use of streets, highways and all other vehicular facilities, traffic control and regulation, zoning, signs and buildings.
 Section 10–204(75) of the Transportation Article, Md.Code (1977, 2008 Repl.Vol.). Unless otherwise noted, all references to Section 75 are to Section 10–204(75) of the Transportation Article, Md.Code (1977, 2008 Repl.Vol.).

3. The question presented by Ms. Tinsley's petition is:
 Whether Tinsley's claims against WMATA are barred by governmental immunity under Section 80 of the WMATA Compact?
 The questions presented in WMATA's conditional cross-petition in the Tinsley matter are:
 1. Whether Plaintiff's claims against WMATA, which challenged the timeframe when WMATA allegedly operated the platform cleaning machine, are barred by WMATA's governmental immunity?
 2. Whether Plaintiff failed to make a *prima facie* case of negligence where she acknowledged observing the wet platform before exiting

each case, we also granted WMATA's conditional cross-petitions for certiorari, but, because we shall uphold WMATA's immunity from suit, we shall not address the issues presented in the conditional cross-petitions.

## BACKGROUND

### A. WMATA Compact

■ The WMATA Compact is an interstate agreement among Maryland, Virginia, and the District of Columbia to create an interstate entity responsible for overseeing a mass transportation system in and around the District of Columbia.

---

the train onto the platform and the presence of a cone warning of a wet floor prior to her fall?

3. Whether the circuit court erred in allowing the testimony of Plaintiff's expert witness that questioned WMATA's immunized selection of cleaning products?

The questions presented by Ms. Hodge are:

1. Whether Hodge's claims against WMATA are barred by governmental immunity under § 80 of the WMATA Compact, codified as Md. Transport. § 10–204.

2. Whether WMATA's claimed immunity is limited by § 75 of said compact, which provides that WMATA *"shall comply with all laws, ordinances and regulations of the signatories and political subdivisions* and agencies thereof *with respect to use of* streets, highways and all other vehicular facilities, traffic control and regulation, zoning, signs and *buildings "* (emphasis added [by Ms. Hodge]), as there exists a wide body of case law in Maryland providing for premises liability?

3. Whether WMATA's claimed immunity is limited by § 75 of said compact, which provides that WMATA *"shall comply with all laws, ordinances and regulations of the signatories and political subdivisions* and agencies thereof *with respect to use of* streets, highways and all other vehicular facilities, traffic control and regulation, zoning, signs and *buildings "* as Prince George's County has enacted a Property Standards and Management and a Fire Prevention Code which preclude commercial businesses from failing to clean and police their floors.

WMATA presents the following questions in its conditional cross-petition in the Hodge matter:

1. Whether this Court should by-pass the Court of Special Appeals where the briefing before this Court in *Tinsley v. WMATA* is well underway, and where that case contains additional issues unrelated to the instant case?

2. Whether Plaintiff failed to make a *prima facie* case of negligence as a matter of law in light of the blizzard which occurred shortly before Plaintiff's fall?

The Compact was approved in Maryland in 1965, Chapter 869 of the Laws of 1965, and was ratified by Congress in 1966, Washington Metropolitan Area Transit Authority Compact, Pub.L. No. 89–774, 80 Stat. 1324 (1966). By virtue of Congressional ratification, issues involving the interpretation of the Compact are questions of federal law. *Cuyler v. Adams*, 449 U.S. 433, 438, 101 S.Ct. 703, 707, 66 L.Ed.2d 641, 648 (1981) ("[C]ongressional consent transforms an interstate compact within [the Compact] Clause into a law of the United States . . . .").

■ Central to this case is the doctrine of state sovereign immunity. Under this doctrine, courts do not have jurisdiction to hear cases involving claims for money damages against the State, absent the State's consent to such suit. *Ritchie v. Donnelly*, 324 Md. 344, 597 A.2d 432 (1991). As Judge John C. Eldridge has written for this Court, "[t]he theory that, in the absence of a statute, the State itself cannot be held liable in damages for acts that are unconstitutional rests on public policy and a theoretical notion of the 'State.'" *Id.* at 369, 597 A.2d at 444; *see also Beka Indus. v. Worcester County Bd. of Educ.*, 419 Md. 194, 18 A.3d 890 (2011); *Magnetti v. University of Md.*, 402 Md. 548, 937 A.2d 219 (2007).

■ In considering whether the doctrine of sovereign immunity prevents a court from exercising jurisdiction in a given suit, we ask " '(1) whether the entity asserting immunity qualifies for the protection; and, if so, (2) whether the legislature has waived immunity either directly or by necessary implication, in a manner that would render the defense of immunity unavailable.'" *Beka Indus.*, 419 Md. at 206, 18 A.3d at 900, quoting *Magnetti*, 402 Md. at 557, 937 A.2d at 224.

■ WMATA enjoys sovereign immunity as a result of the Compact's signatories "confer[ring] their respective sovereign immunities upon it." *Morris v. Washington Metropolitan Transit Authority*, 781 F.2d 218, 219 (D.C.Cir.1986); *see also Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201, 206 (4th Cir.2002); *Proctor v. Washington Metropolitan Area Transit Authority*, 412 Md. 691, 708, 990

A.2d 1048, 1057–58 (2010). WMATA's sovereign immunity has been waived, under certain circumstances, by Section 80 of the Compact, which states:

The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this title shall be construed as a waiver by the District of Columbia, Maryland, Virginia and the counties and cities within the zone of any immunity from suit.

Section 10–204(80) of the Transportation Article, Md.Code (1977, 2008 Repl.Vol.).

 Under Section 80 of the Compact, WMATA has waived immunity for proprietary functions but retained it for governmental functions. *Proctor,* 412 Md. at 710, 990 A.2d at 1059. To determine whether a function is proprietary or governmental, courts, both federal and state, within the jurisdiction in which WMATA operates, employ a test in which the controlling inquiry is whether the challenged activity involves an element of discretion or choice that is "grounded in social, economic, and political policy." *Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531, 541 (1988) (internal quotations omitted); *see also Smith,* 290 F.3d at 206; *Burkhart v. Washington Metropolitan Area Transit Authority,* 112 F.3d 1207, 1216–17 (D.C.Cir.1997); *Sanders v. Washington Metropolitan Area Transit Authority,* 819 F.2d 1151, 1154–55 (D.C.Cir.1987); *Washington Metropolitan Area Transit Authority v. Barksdale–Showell,* 965 A.2d 16, 20–21 (D.C.2009). If the activity does involve an element of choice grounded in public policy, it is governmental and the agency is immune from suit; if the activity does not involve an exercise

of discretion, or the discretion is not grounded in concerns of public policy,[4] then the agency does not enjoy immunity for the action.

## B. The Tinsley Case

Veronica Tinsley and her husband filed a two-count complaint in the Circuit Court for Prince George's County alleging negligence in WMATA's cleaning of the Cheverly Metro Station and that this negligence caused her to slip, fall, and injure her ankle.[5] WMATA filed a general answer, denying all the

---

**4.** One example of an activity that involves discretion, but for which immunity may not apply because the discretion is not grounded in public policy, is driving a car, according to the Supreme Court. *United States v. Gaubert*, 499 U.S. 315, 325 n. 7, 111 S.Ct. 1267, 1275 n. 7, 113 L.Ed.2d 335, 348 n. 7 (1991).

**5.** The Tinsleys' Complaint set forth the following:
1. On or about December 19, 2007, at about 4:45 p.m., plaintiff, Veronica Tinsley, was a paying customer at the Cheverly, Maryland Metro Station, which station was owned and maintained by the Defendant, Washington Metropolitan Area Transit Authority. It was a clear day and plaintiff had just exited the subway at the aforesaid station. As she walked carefully and while exercising due care for her safety she slipped and fell on the wet platform.
2. This incident would not have occurred but for the fact that defendant WMATA's employees negligently failed to maintain the platform; negligently failed to post signs or other warnings; failed to provide a safe method of egress for its customers; and were otherwise negligent.
3. As a direct and proximate result of the aforesaid negligence, plaintiff Veronica Tinsley sustained an injury to all parts of her body, some of which are believed to be permanent, especially to her right ankle which was fractured and required surgery, suffered and shall suffer great pain of body and mind, incurred and shall incur medical and out-of-pocket expenses, lost and shall lose time and wages from her employment, and, as a result, has been damaged in the amount of $1,000,000.00.

\* \* \*

4. At the time of the said injuries, plaintiffs Veronica Tinsley and David Tinsley were and are now husband and wife.
5. As a direct result of the aforesaid negligence, plaintiffs Veronica Tinsley and David Tinsley have suffered a loss of consortium, have suffered an interruption of their marital relationship, have suffered damage to their social, recreational, sexual and spiritual relationship, and as a result they have therefore been damaged in the amount of $250,000.00.

allegations in the complaint, and specifically asserted that it was immune from suit under Section 80 of its Compact:

### Fifth Defense

All or some of Plaintiffs' claims may be barred by Defendant WMATA's governmental immunity under Section 80 of the WMATA Compact as codified in § 10–204 of the Transportation Article of the Annotated Code of Maryland (2004).

Prior to trial, WMATA moved for summary judgment, asserting that it was immune from suit under Section 80, because Ms. Tinsley's allegations that WMATA was negligent in the timing of its floor cleaning, and the manner in which the floor was cleaned were matters within the category of "government functions" and barred by immunity.

The Tinsleys answered by arguing that WMATA had an internal policy requiring maintenance personnel to avoid cleaning the platform before 7:00 P.M. This mandate, they argued, rendered the timing of cleaning within the purview of "proprietary functions," not "governmental functions," because WMATA employees had no discretion as to when they should clean. As a result, they alleged, WMATA could not claim immunity for its decision as to when and how it cleaned its facility. In doing so, the Tinsleys relied on the deposition testimony of one of the maintenance workers for WMATA who stated that he was told he should clean after the rush hour, which ended around 7:00 P.M.

The Tinsleys also argued that, even if the court were to consider the maintenance worker's testimony to be insufficient to establish the existence of a mandatory policy, decisions regarding the timing of maintenance were not "grounded in social, economic or political goals" under the immunity umbrella. WMATA, thus, was liable for its negligent cleaning, the Tinsleys contended.

WMATA's motion for summary judgment was denied without a hearing, and the case proceeded to trial. Ms. Tinsley testified that she was a regular rider of the WMATA subway system and was familiar with the Cheverly station. According

to her testimony, she noticed that the entire floor was wet when she exited the subway car and that she saw a yellow cone warning of the wet floor. Ms. Tinsley testified that she saw a dry patch of floor, attempted to walk across the wet floor to that dry area, reached it, but fell and broke her ankle as she stepped onto the dry area:

At that particular point, my right foot made it onto the dry area and when I went to take my next step with my left foot, that foot slipped from under me, my body turned, I fell to the floor, my ankle snapped as I fell, and that was what happened.

To support her claim for negligence, Ms. Tinsley introduced into evidence the videotaped deposition testimony of Francis Mullen, who was accepted by the court as an expert in the area of architecture and safety. Relying on climatological records from the United States Department of Commerce for Dulles International Airport, Mr. Mullen opined that, given the environmental conditions, the floor could not have been wet as a result of condensation or any other environmental factors.[6] Mr. Mullen then testified that a slip-resistance test that he performed on the floor of the platform at the Cheverly station indicated that the station floors were unreasonably slippery when wet with a solution of water and a cleaning agent, Super Shine All, a product that WMATA uses to clean the station platforms.

Ms. Tinsley additionally called several WMATA employees, including Cheverly station manager Barbara London and maintenance workers Michael Myrick, Jr. and Linwood Vaughn. Ms. London testified that the weather at the time of the incident was cloudy and that she observed the wet floor. Mr. Myrick, a custodian, testified that his duties included spot-cleaning the Cheverly station floor with a mop and bucket using a solution of water and Super Shine All and that there

---

**6.** Mr. Mullen testified that the weather on the day of Ms. Tinsley's injury was cloudy, fluctuating in temperature from 30 to 40 degrees Fahrenheit, with a dew point of 23 degrees Fahrenheit, an average humidity of approximately 70 percent, and no precipitation.

were no restrictions on the time during which he was permitted to mop the station floor. Mr. Vaughn, a cleaning machine operator, testified that he used a solution of water and Super Shine All to clean the entire station floor. He stated that the co-worker who trained him to operate the cleaning machine told him to clean the floors after rush hour ended, which was generally after 7:00 p.m. On cross examination, Mr. Vaughn testified that he was never told that he was prohibited from cleaning the entire floor before 7 p.m.

WMATA moved for judgment, contending that "when Metro cleans its platforms, how it cleans its platforms and with what products or mechanisms it cleans its platforms, is something for which it's immune from suit." WMATA argued that the evidence of a coemployee's recommendation as to the time that a platform should be cleaned does not rise to the level of "policy" and that at best Mr. Vaughn's testimony was evidence of WMATA's internal custom and practice, shielded from suit by sovereign immunity. Additionally, WMATA argued that Ms. Tinsley failed to produce evidence sufficient to prove a prima facie case of negligence and she failed to adduce any standard of care by which Metro should be judged. Finally, WMATA contended that it satisfied any duty owed to Ms. Tinsley because it was undisputed that WMATA warned of the dangerous condition by placing warning cones in the station.

Ms. Tinsley countered that she established the existence of a mandatory policy that stations were to be cleaned only after peak travel times, noting that because a policy existed, WMATA was not immune from suit. Further, Ms. Tinsley argued that WMATA could not discharge its duty to customers by merely placing warning cones, because passengers enjoy "a right to a safe exit from the subway train." The judge denied WMATA's motion.

WMATA then called its Assistant Superintendent and Cleaning Manager, Freddie Ross, who testified that custodians and cleaning machine operators are not restricted as to the time at which they were permitted to clean. WMATA next recalled Ms. London, Cheverly's station manager, who testified that she did not observe any cleaning equipment on

the platform on the day of the incident, and that, in a addition to being cloudy, the weather at the time of the incident was, to the best of her recollection, "misty," which resulted in her notation in her incident report of wetness caused by "condensation" on the platform.

At the close of its evidence, WMATA renewed its motion for judgment. The court denied that motion, and the jury awarded Ms. Tinsley $64,213.78 in damages.

WMATA timely appealed to the Court of Special Appeals, which reversed the judgment of the circuit court in a reported opinion, *Washington Metropolitan Area Transit Authority v. Tinsley*, 202 Md.App. 115, 32 A.3d 75 (2011). Our intermediate appellate court concluded that "WMATA's employees were performing discretionary acts in deciding at what time the train platforms were to be cleaned, as well as the manner and means used in so doing," and thus Tinsley's suit was barred by sovereign immunity. *Id.* at 133–37, 32 A.3d at 85–88. The court noted that, like WMATA's policy for dealing with hazards resulting from weather, which was held to be shielded by governmental immunity, *Washington Metropolitan Area Transit Authority v. Barksdale–Showell*, 965 A.2d 16 (D.C. 2009), "WMATA's cleaning and maintenance policies were flexible enough to allow its maintenance personnel to respond to potential hazards." *Tinsley*, 202 Md.App. at 136, 32 A.3d at 87. The court additionally held that decisions regarding time and manner of cleaning are subject to policy analysis and are shielded by sovereign immunity. *Id.* at 136–37, 32 A.3d at 87–88.

## C. The Hodge Case

Ms. Hodge filed a two-count complaint in the Circuit Court for Prince George's County alleging that WMATA was negligent for failing to clean water from the floor of the Plaza Metro Station.[7] WMATA filed an answer, generally denying the allegations in the Complaint and specifically raising the defense of sovereign immunity, which was substantially similar

---

7. Ms. Hodge set forth the following in her complaint:

**230**

to that filed in the Tinsley case. No substantive, pre-trial motions were filed.

At trial in the Circuit Court for Prince George's County, Ms. Hodge testified she observed the damp floor earlier in the morning, when she boarded her train at the Prince George's Plaza Metro Station to commute to the District of Columbia. She testified that she observed the entire floor of the station to be wet. After taking the escalator to the mezzanine level and noticing that the floor of that level was similarly wet, Ms. Hodge testified that, as she made her way toward the fare gates, she lost her footing and fell to the floor.

To establish the conditions at the Metro Station and the reasons why the floor was wet that day, each party called WMATA Station Manager Wanda Scott during their case-in-chief. Ms. Scott testified that both the platform and the

7. That on or about February 18, 2010, Plaintiff Hodge was a business invitee at the Prince George's County Plaza Metro station.
8. That on the date of the occurrence, unbeknownst to Plaintiff Hodge, an area of water had pooled near the main booth inside the station creating an unreasonably dangerous condition.
9. That such pooled water was not open and obvious.
10. That Plaintiff Hodge was carefully and prudently proceeding in said METRO station, at which time, through no fault or negligence of her own, she was caused to slip of said water that had accumulated.
11. That Defendant WMATA by and through its agents, servants and/or employees knew, or in the exercise of due caution and diligence, should have known of the unreasonably dangerous condition, but failed to take any measures to protect and/or advise customers of its presence.
12. That Defendant WMATA owed a duty of care to Plaintiff Hodge to protect her and advise her of the unreasonably dangerous condition then and there existing, and should have corrected same, should have properly inspected the premises for such conditions and should have warned the Plaintiff and other patrons of the dangerous condition.
13. That Defendant WMATA breached its duty of care to Plaintiff Hodge in when it carelessly and negligently failed to take any measures to correct said condition and/or protect or advise Plaintiff of the unreasonably dangerous condition.
14. That as a direct and proximate cause of Defendant WMATA's breach, Plaintiff Hodge was caused to slip and fall, sustaining painful injuries, some of which may be permanent, incurred medical bills, lost time from her usual avocation, and endured pain and suffering and other non-economic damages.

mezzanine levels were wet from patrons tracking snow through the station. She stated that there were numerous wet floor cones placed throughout the station on both levels warning patrons of the water on the floor, and identified the cones in a photograph of the Metro Station that was entered into evidence.

At the close of the Plaintiff's case, WMATA moved for judgment, arguing that it was immune from suit under Section 80 of the Compact. It asserted that *Washington Metropolitan Area Transit Authority v. Barksdale–Showell,* 965 A.2d 16 (D.C.2009), made clear that WMATA is immune from suit for decisions related to the manner in which it deals with moisture issues in its stations. It also cited *Smith v. Washington Metropolitan Area Transit Authority,* 290 F.3d 201 (4th Cir. 2002), for the principle that maintenance decisions fall into the category of "governmental functions" that are protected under the Compact.

Ms. Hodge responded by arguing that Section 75 of the Compact, referencing WMATA's mandatory compliance with state and local laws with "respect to the use of streets, highways, vehicular facilities, traffic control and regulation, zoning, signs and buildings," waived immunity for all violations of Maryland law, generally, and waived immunity specifically for violations of county codes. Ms. Hodge referenced Sections 13–230 and 13–213 of Title 13 of the Prince George's County Code that set forth the requirement that "[a]ll improved and unimproved property shall be maintained in a clean, safe, secure, and sanitary condition, free of graffiti and in conformance with this division so as not as to create a public nuisance or adversely affect the public health, safety, or welfare." She argued that Section 75 of the Compact, when read in concert with these provision from the Prince George's County Code, removed WMATA's maintenance decisions from within the purview of its immunity. Finally, Ms. Hodge argued that WMATA had waived its ability to claim a defense of sovereign immunity by failing to assert it as an affirmative defense when asked during discovery, despite having asserted it in the answer to Ms. Hodge's complaint.

WMATA also argued that Ms. Hodge had not set forth a prima facie case of negligence. Specifically, WMATA asserted that Ms. Hodge presented no evidence of the appropriate standard of care, and, even assuming she had put forth such evidence, it was undisputed that she was aware of the water on the floor by virtue of the yellow warning cones it had placed in the station. Finally, WMATA argued that even if the court did not accept Ms. Scott's testimony that warning cones were present, because of Ms. Hodge's testimony that she was aware of the water causing the floor to be very slippery, the danger was open and obvious, and WMATA was not liable. Ms. Hodge responded by stating that the jury is the entity that sets the standard of care and that the appropriate standard is "reasonable care."

After the trial judge denied WMATA's motion for judgment, WMATA called its Manager of Special Projects in its Office of Plant Maintenance, Christopher Moore, who supervised the WMATA employees who were responsible for daily cleaning of the stations and also for snow removal efforts. Mr. Moore testified that WMATA's policy regarding moisture on station floors is to place warning signs and allow the water to evaporate. Mr. Moore further testified that routine station cleaning by machine is performed approximately once per week and that spot cleaning is performed as necessary.

At the close of its case, WMATA renewed its motion for judgment, by arguing that Ms. Hodge had not proven a standard of care and that the wet floor was an open and obvious danger of which she was aware. WMATA also attempted to argue that it was immune from suit, but the trial judge refused to rule on that issue, stating, "You've raised the issue of immunity and, you know, I'm a trial judge. I'm not sitting here as a motions judge. I don't mean to sound indifferent, and I'm certainly going to consider what you have to say. But I think the best option for me at this stage is quite simply to reserve on the immunity issue because I still would have the motion for judgment notwithstanding verdict that I can rule on."

The jury found in favor of Ms. Hodge and awarded her $18,945.77. On the same day, the Court of Special Appeals filed its opinion in *Tinsley*, 202 Md.App. 115, 32 A.3d 75. WMATA moved for judgment notwithstanding the verdict, contending that *Tinsley* controlled and arguing that because the decision regarding removal of weather related wetness was a discretionary decision regarding a governmental function, the case against it was barred by sovereign immunity. WMATA alternatively contended that Ms. Hodge's admitted knowledge of the wetness, in combination with the warning cones WMATA placed conspicuously throughout the station, satisfied any duty owed by WMATA to warn passengers of the dangerous condition.

Ms. Hodge countered that, were WMATA to be immune generally, its immunity is limited by Section 75 of the WMATA Compact, which required WMATA to follow state and local law regarding buildings, thereby subjecting WMATA to both common law premises liability and the Prince Georges County Housing and Property Standards Code.[8] Ms. Hodge argued that because the Code requires that commercial buildings maintain the premises in a clean and safe manner, free from public nuisances, WMATA was bound to clean the stations when they become "unsafe" or "unclean" by water and ice tracked in by Metro patrons.[9] Ms. Hodge additionally argued that the Prince Georges County Fire Prevention Code prohib-

---

**8.** The Prince Georges County Housing and Property Standards Code, Property Standards and Maintenance Division sets out "the minimum standards and the responsibilities for maintenance of structures, equipment, and exterior property for all property and structures used or zoned for commercial and industrial purposes in Prince Georges County...." Section 13–230. The Code requires that:

> All improved and unimproved property shall be maintained in a clean, safe, secure, and sanitary condition, free of graffiti, and in conformance with this Division so as not to create a public nuisance or adversely affect public health, safety, or welfare.

Property Standards and Management Division, Section 13–233.

**9.** Public nuisance is defined as "Any physical condition or use which would constitute an unsafe condition or structure under ... Subtitle 11,

its any condition that will "prevent, delay, hinder, or interfere with the free use of" any area "leading to or from an entrance or exit." Prince George's County Fire Prevention Code Section 11–254(i). Thus, Ms. Hodge contended, WMATA's decisions regarding weather related cleanup are proprietary and not governmental, because they are subject to regulation by the county code.

The trial judge disagreed with Ms. Hodge's arguments, reasoning that *Tinsley* controlled and granted WMATA's motion for judgment notwithstanding the verdict.

**DISCUSSION**

■ Although we have considered very few cases involving the WMATA Compact, our colleagues on the United States Courts of Appeals for the Fourth and District of Columbia Circuits have issued a myriad of opinions involving WMATA's immunity. As was thoroughly explained by the United States Court of Appeals for the District of Columbia Circuit, when considering whether WMATA was entitled to immunity in *Morris v. Washington Metropolitan Transit Authority*, 781 F.2d 218, 219 (D.C.Cir.1986), WMATA's immunity protects the States in which WMATA operates from money judgments against them. As that court wrote, "We think that, where an agency is so structured, that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency." *Id.* at 227. As is evident, the purpose of WMATA's immunity is to shield the State from demands for money judgments. *See also Proctor v. Washington Metropolitan Area Transit Authority*, 412 Md. 691, 711, 990 A.2d 1048,

---

Fire Safety, Prince George's County Code; ... or [a]ny property which is unclean, unsanitary, or which is littered with rubbish or garbage...." Property Standards and Management Division, Section 13–231(a)(6)(D), (F). The Prince George's County Fire Safety Code, Section 11–254(i), provides that:

No person shall block, impede, or obstruct any aisle, passageway, hallway, lobby, foyer, or stairway, leading to or from an entrance or exit required by law, which will prevent, delay, hinder, or interfere with the free use of such passageway by any person.

1059 (2010) (stating that, under the general principle of sovereign immunity, "the State and its agencies [can] not be sued unless the General Assembly authorized suit *and enabled State agencies to obtain funds necessary to satisfy judgments*" (emphasis added) (internal quotations omitted)). WMATA's immunity, however, is not absolute. As Section 80 of the Compact makes clear, its immunity is limited to governmental functions rather than proprietary functions.

In considering the distinction between governmental and proprietary functions, both the United States Courts of Appeals for the Fourth and District of Columbia Circuits have employed a test, developed under the Federal Tort Claims Act, 28 U.S.C. Section 2671 et seq. (2012), under which the court determines whether the activity is "discretionary" or "ministerial," *Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201 (4th Cir.2002); *Sanders v. Washington Metropolitan Area Transit Authority*, 819 F.2d 1151, 1154–55 (D.C.Cir.1987), rather than whether it is governmental or proprietary, as is expressed in the Compact. As the Fourth Circuit recognized, however, the discretionary/ministerial distinction is merely a tool for analysis:

> Although these two tests—"governmental/proprietary" and "discretionary/ministerial"—are not coterminous, the discretionary acts of public officials are recognized as being "within a subset of governmental functions." In essence, all "discretionary" activities of a governmental entity under the [Federal Tort Claims Act] constitute "governmental" activities within the meaning of the "governmental/proprietary" test. Therefore, the legal principles developed under the [Federal Tort Claims Act] are a useful analytical tool for identifying the scope of the METRO's immunity.

*Smith,* 290 F.3d at 206–207 (internal citations omitted). Any activity, then, that is classified as "discretionary" under the Federal Tort Claims Act test would also be "governmental" under the Compact.

The Court of Special Appeals, in *Tinsley,* also employed the language used in the federal circuit courts' cases, because

neither this court nor the United State Supreme Court had interpreted Section 80 with respect to what constitutes a governmental or proprietary function. We, however, prefer to rely on the language of the Compact for the distinction, that being governmental and proprietary, rather than the Federal Tort Claims Act distinction, to conform with the Statute, although our evaluation necessarily will rely on federal cases involving the latter analysis.

## A. Maintenance Determinations

The District of Columbia Court of Appeals recently considered the issue of negligent maintenance in the context of a wet station floor in *Washington Metropolitan Area Transit Authority v. Barksdale–Showell*, 965 A.2d 16 (D.C.2009). In that case, Patricia Barksdale–Showell entered the Anacostia Metro Station and noticed that the floor was wet, although there were no warning signs or cones present. After purchasing her ticket, she boarded the escalator down to the train platform but slipped, fell, and fractured her leg. She sued WMATA, alleging that it was negligent in "fail[ing] to inspect, maintain, and repair the wet conditions in the station" and in failing to warn of the wet floor. *Id.* at 19.

Prior to trial, WMATA filed a motion to dismiss, on the ground of sovereign immunity. The trial judge ruled that WMATA was immune for suit for "the negligent inspection, maintenance, and repair claim," *Id.* at 20, but not for the alleged failure to warn claim. The case proceeded to trial, and the jury returned a verdict in favor of Ms. Barksdale–Showell for WMATA's failure to warn her of the wet floor.

Both parties appealed, and the District of Columbia Court of Appeals affirmed, holding that immunity barred suit against WMATA for its alleged negligence in regard to its maintenance decisions, because the issues of when, how, and where to clean were the types of policy considerations that WMATA's immunity was intended to shield against.[10] *Id.* at 23.

---

10. The District of Columbia Court of Appeals affirmed the trial court's ruling on the failure to warn claim as well, but that issue is not

The court noted that there was nothing that mandated that WMATA take any specific course of action when conducting its maintenance of the metro stations. *Id.* at 22. The court considered Ms. Barksdale–Showell's argument that it was WMATA internal policy that required station managers to inspect the metro stations and correct any issues, but opined that nothing in that requirement actually prescribed a mandatory procedure or course of action; thus the maintenance decision required an exercise of discretion. *Id.* at 22 n. 5, 23.

The court then considered whether the discretion WMATA employees had when dealing with maintenance issues was grounded in concerns of policy and agreed with the trial court that they were, reasoning that WMATA employees balanced the costs of cleaning water from the floor as passengers tracked it in from the outside, against the realities of WMATA's budget. *Id.* at 23–24. The court also considered important the policy considerations of when to clean, noting that WMATA employees were in the best position to make that day-to-day determination. *Id.* at 22–23. The court noted that a maintenance worker exercises discretion in deciding whether to impede the use of the station by cleaning during busy times or to allow unclean areas to fester—a determination that can only be described as a policy choice, falling under the umbrella of governmental function. *Id.*

The United States Court of Appeals for the Fourth Circuit invoked similar reasoning in *Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201 (2002). In that case, Richard Lee Smith took the subway to the Bethesda, Maryland, Metro Station, where he was required to walk up a stationary escalator, because the other two escalators were not functioning properly and had been disassembled.[11] Upon

---

pertinent to the instant cases. *Washington Metropolitan Area Transit Authority v. Barksdale–Showell*, 965 A.2d 16, 22–26 (D.C.2009).

**11.** WMATA made the decision to use the one remaining escalator as a "stationary walker" so that traffic could move both up and down without having to wait for an elevator. *Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201, 203 (2002).

reaching the summit, he suffered a fatal heart attack, and his relatives filed suit against WMATA, alleging that it had negligently used one escalator as a stationary walker, negligently repaired the other two escalators in violation of federal guidelines, was negligent in the manner in which it maintained its lighting, and negligently failed to warn the patrons of the escalator outage. Prior to trial, WMATA filed a motion for summary judgment, asserting that it was immune from suit under all the theories of negligence Mr. Smith's estate asserted. The trial court determined that WMATA was immune for its alleged negligence with respect to lighting, but not for any of the other assertions of negligence. WMATA then filed an interlocutory appeal challenging the court's immunity determination.

In vacating and remanding the case, the Fourth Circuit held that WMATA was immune from suit for its decision to shut down the two escalators and utilize the remaining one as a "stationary walker" because, "[t]hat decision is 'susceptible to policy analysis,'" and, more specifically, because whether or not it was more economical to wait until all the parts for the malfunctioning escalators to arrive before reassembling them was a question of economic policy deserving of immunity. *Id.* at 209–210. The court also held that WMATA was immune for its failure to warn patrons of the danger, because the danger was open and obvious, and WMATA had no duty to warn of an open and obvious danger. *Id.* at 210.

With respect to the contention that WMATA had been negligent in failing to abide by federal guidelines for the repair of escalators, the court remanded the case for such a determination, noting that if WMATA had failed to abide by obligatory regulations, it was not immune from suit, but if it did so abide or there were no applicable regulations, its maintenance decisions were immune from attack. *Id.* at 211. Eventually,[12] the district court determined that WMATA was

---

12. The Fourth Circuit first remanded the case to the district court to determine whether there was a policy in place, such as the federal American National Standards Institute guidelines, that obligated WMA-

immune from suit for its maintenance decisions because there were no mandatory maintenance policies governing the escalators. *Smith v. Washington Metropolitan Area Transit Authority*, Case No. AW–99–2187, 2007 WL 6605238 (D.Md. 2007).

█ In the present cases, both Ms. Tinsley's and Ms. Hodge's assertions fall into the same category as those in *Smith* and *Barksdale–Showell:* challenges to the manner in which maintenance functions are carried out, but not in violation of any mandatory directive.[13] WMATA's decision to clean the entire Station floor at the time that Ms. Tinsley was using the Metro system was one based on economic and policy considerations. WMATA employees, in determining when is the best time to clean, are balancing concerns of ensuring safe conditions against not impeding pedestrian traffic, as well as

---

TA to follow a specific course of action. *Smith v. Washington Metropolitan Area Transit Authority*, 290 F.3d 201, 211 (2002). On remand, the district court determined that WMATA had not violated any specific directive and, believing it was limited to considering only American National Standards Institute violations, ruled that WMATA was immune, without considering Smith's assertion that WMATA had internal policies that did dictate a specific course of action. *Smith v. Washington Metropolitan Area Transit Authority*, Case No. AW–99–2187, 2004 WL 5298831 (D.Md. Dec. 16, 2004). Smith appealed this decision, and the Fourth Circuit again remanded the case, instructing the district court to examine all the sources of alleged mandatory courses of action, including the alleged internal policies, because it had only referenced the American National Standards Institute standards as an example of regulations that could proscribe specific courses of action. *Smith v. Washington Metropolitan Area Transit Authority*, 184 Fed.Appx. 311, 315–316 (4th Cir.2006).

The district court then concluded that WMATA was immune, reasoning that the internal guidelines that purportedly established the mandatory course of action upon which Smith relied did not, in fact, obligate WMATA to take any specific course of action. *Smith v. Washington Metropolitan Area Transit Authority*, Case No. AW–99–2187, 2007 WL 6605238 (D.Md. Apr. 13, 2007).

13. Ms. Tinsley argues that WMATA had a mandatory policy prohibiting its workers from cleaning the floor prior to 7:00 pm, but did not establish that any specific course of action was mandated. Rather, the evidence presented at trial established that WMATA workers were told the best time to clean was after 7:00 pm, but that they were never instructed to avoid cleaning before then.

how often to clean, balancing concerns involved in creating a cleaning schedule against WMATA's budget. Similarly, WMATA's decision to allow water to evaporate in the station Ms. Hodge visited, as opposed to mopping it up after patrons tracked it into the station, was based on policy and economic decisions related to the most efficient method for conducting maintenance operations. *Barksdale–Showell,* 965 A.2d at 22–24 (upholding immunity for WMATA for allowing water on an escalator to evaporate, rather than mopping it away, because WMATA had made a policy decision, based on its allocation of maintenance resources). Just as in *Smith* and *Barksdale–Showell,* WMATA employees made determinations as to how best to complete a necessary maintenance task, determinations based on economic and policy considerations for which WMATA has immunity.

█ Ms. Tinsley asserts that *Barksdale–Showell* is inapposite to her case because WMATA allegedly created the wet floor upon which she slipped, while in *Barksdale–Showell* WMATA did not. The source of the allegedly dangerous condition, however, is not the dispositive issue. The controlling inquiry when determining whether WMATA is immune is if the "decision is one which we would expect inherently to be grounded in considerations of policy." *Smith,* 290 F.3d at 208 (internal quotation omitted). Because the underlying decision, proper maintenance procedures, was grounded in concerns of economic and public policy, WMATA is immune from suit, regardless of the source of the water.

### B. Section 75 of the Compact

█ Ms. Hodge also contends that in Section 75 of the Compact, WMATA's immunity is waived with respect to her claims, however. Section 75 of the Compact states, in relevant part, that WMATA "shall comply with all laws, ordinances and regulations of the signatories and political subdivisions and agencies thereof with respect to use of streets, highways and all other vehicular facilities, traffic control and regulation, zoning, signs and buildings." Ms. Hodge contends that this Section requires WMATA to comply with all laws relating to

building use. Her contention, however, directly contradicts the plain meaning of the statute.

The statute at issue requires WMATA to comply with the laws regulating the use of streets, highways, and all other vehicular facilities, as well as the laws regulating traffic control, zoning, signs, and buildings. It does not require WMATA to comply with laws governing the *use* of buildings, the *use* of signs, or the *use* of zoning laws. Under Section 75, WMATA must comply with the laws governing the use of "streets, highways and all other vehicular facilities" and the laws generally governing "traffic control and regulation, zoning, signs and buildings."

The legislative history behind Congress' ratification of the Compact corroborates our interpretation. The Report on Senate Bill 3488 of 1966, Report No. 1491, explains in detail the purpose of each provision of the Compact. With respect to Section 75, it states that the Section, "[p]rovides that the Board shall comply with all laws, ordinances, and regulations of the signatories and the political subdivisions and agencies thereof with respect to the use of streets, highways, and all other vehicular facilities, traffic control and regulation, zoning signs, and building *codes*." Senate Report 1491, 89th Congress, 19 (emphasis added). Ms. Hodge's contention that Section 75 waived WMATA's immunity in her case is, therefore, without merit.

For the forgoing reasons, we hold that WMATA is immune from suit in both cases for the claims asserted against it by the Tinsleys and Ms. Hodge, including the Tinsleys' Loss of Consortium Claim.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IN CASE NO. 1 AFFIRMED; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

**JUDGMENT NOTWITHSTANDING THE VERDICT GRANTED BY THE CIRCUIT COURT FOR PRINCE**

GEORGE'S COUNTY IN CASE NO. 25 AFFIRMED; COSTS TO BE PAID BY PETITIONER.

HARRELL and MCDONALD, JJ., concur.

HARRELL, J., concurring, in which McDONALD, J., joins.

I join the Court's opinion and disposition in *Tinsley v. WMATA*. I join also the opinion's analysis in *Hodge v. WMATA* of Hodge's contentions that mirror Tinsley's contentions; however, I am unable to join the Majority's reasoning in *Hodge* as to its rejection of her contention that § 75 of the WMATA Compact, in conjunction with certain provisions of the Prince George's County Code placing a duty of maintenance on the owners of "[a]ll improved ... property ... [to be kept] in a clean, safe, secure ... condition ... so as not to create a public nuisance or adversely affect the public health, safety, or welfare," overcomes WMATA's immunity in § 80 of the Compact. Although I agree that Hodge, on this record, should not prevail, it is for reasons that differ from the Majority opinion's explication. *See Tinsley and Hodge v. WMATA*, 429 Md. 217, 239-41, 55 A.3d 663, 676-77 (2012).

Section 75 of the WMATA Compact[1] provides, as noted in the Majority opinion:

75. **Compliance with laws, regulations, and ordinances.**

The board shall comply with all laws, ordinances and regulations of the signatories and political subdivisions and agencies thereof with respect to *use of* streets, highways *and* all other vehicular facilities, traffic control and regulation, zoning, signs, *and buildings*.

*Tinsley and Hodge v. WMATA*, 429 Md. 217, 221 n. 2, 55 A.3d 663, 666 n. 2 (2012) (emphasis added). As Hodge's argument goes, she points to several provisions in the Prince George's County Code which, she maintains, have the effect of placing an obligation on WMATA to clean and maintain the platforms

---

1. Codified in Maryland at Maryland Code (2001, 2008 Repl.Vol.), Transportation Article, § 10–204.

and floors of its stations in the County according to some generalized standards, thus answering in her favor the immunity conundrum of whether proprietary versus governmental functions are implicated. Those local ordinance provisions are, in relevant part:

**Prince George's County Code, Property Standards and Maintenance, § 13–230. Scope.**

The provisions of this Division provide the minimum standards and the responsibilities for maintenance of structures, equipment, and exterior property for all property and structures used or zoned for commercial and industrial purposes in Prince George's County and for residentially zoned property where the use is other than residential.

**Prince George's County Code, Property Standards and Maintenance, § 13–231. Definitions.**

(a) The following words and phrases shall have the meanings indicated:

\* \* \*

(3) Maintenance shall mean acts of repair or other acts to prevent a decline in the conditions of grounds, structures, and equipment such that the condition does not fall below the standards established by this Division and other applicable statutes, codes, and ordinances.

(4) Owner shall mean any person as defined in Section 1–102 of this Code who owns, leases, occupies, or controls the property and any agent of such person.

(5) Property shall mean any land utilized or zoned for commercial or industrial purposes, or residentially zoned where the use is other than residential, and any improvement thereon.

(6) Public nuisance shall mean and include the following:

(A) the physical condition or use of any premises regarded as public nuisance at law; or

\* \* \*

(D) Any physical condition or use which would constitute an unsafe condition or structure under Subtitle 4, Building, or Subtitle 11, Fire Safety, Prince George's County Code;

\* \* \*

**Prince George's County Code, Property Standards and Maintenance, § 13–233.**

All improved and unimproved property shall be maintained in a clean, safe, secure, and sanitary condition, free of graffiti, and in conformance with this Division so as not to create a public nuisance or adversely affect the public health, safety, or welfare.

**Prince George's County Code, Property Standards and Maintenance, § 11–254. Exits and means of egress in buildings, generally.**

(a) Exits shall be provided and maintained as required by this Division and the applicable sections of the Prince George's County Building Code.

\* \* \*

(i) No person shall block, impede, or obstruct any aisle, passageway, hallway, lobby, foyer, or stairway, leading to or from an entrance or exit required by law, which will prevent, delay, hinder, or interfere with the free use of such passageway by any person.

\* \* \*

The Majority opinion disposes of Hodge's argument by offering its "plain meaning" view of the language of § 75 of the Compact:

The statute at issue requires WMATA to comply with the laws regulating the use of streets, highways, and all other vehicular facilities, as well as the laws regulating traffic control, zoning, signs, and buildings. It does not require WMATA to comply with laws governing the *use* of buildings, the *use* of signs, or the *use* of zoning laws. Under Section 75, WMATA must comply with the laws governing the use of "streets, highways and other vehicular traffic"

and the laws generally governing "traffic control and regulation, zoning, signs, and buildings."

*Tinsley and Hodge v. WMATA*, 429 Md. 217, 241, 55 A.3d 663, 677 (2012) (emphasis in original). I am unable to subscribe to this de-constructive and overly facile reading. Examining the language of § 75, I conclude that its plain meaning embraces, for present purposes, local laws that regulate the "use" of "buildings." As such, Hodge's argument may not be dismissed so neatly as the Majority does. Rather, Hodge's argument rises or falls on whether she proved, on the record before the trial court, that the local laws upon which she relies applied (or were applicable) to WMATA's stations. In my estimation, she failed to do so.

According to my review of the record extract in Hodge's case, she failed to adduce support that, under the cited County Code provisions, WMATA's stations were: "structures" for purposes of § 13–230 of the Property Standards & Maintenance Division of the County Code; "used or zoned for commercial and industrial purposes" or "residentially zoned," for the purposes of § 13–230;[2] in a condition as of the time of her slip-and-fall such as would constitute a common law nuisance, for purposes of § 13–233 of the same Division; or had been regulated historically or contemporaneously by the County, under the cited County Code provisions. In short, I am unpersuaded by this record that the cited County Code provisions applied (or were applicable) to WMATA's station or its operations at issue here or that the County deemed them to be applicable. For those reasons, I join the judgment of the Majority opinion. Were it established otherwise, I might have been persuaded, based on the reasons stated in *Smith v. WMATA*, 290 F.3d 201, 211 (4th Cir.2002), as to its remand to determine whether federal standards for escalator repair may have been applicable to create a non-discretionary obligation

---

**2.** Many federal and state governmental buildings and uses are not so zoned and, in many cases, are not governed at all by local zoning ordinances and zoning maps. *See, e.g.,* § 27–121 of the Prince George's County Zoning Ordinance.

on WMATA, that a limited remand or outright reversal would have been appropriate in Hodge's case.

Judge MCDONALD authorizes me to state that he joins in the views expressed in this concurring opinion.